Filed 12/11/17

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

        Plaintiff and Respondent,

        v.

JEAN PIERRE RICES,

        Defendant and Appellant.

S175851

San Diego County
Super. Ct. No. SCE266581

Defendant, Jean Pierre Rices, and codefendant, Anthony Miller, were charged with crimes arising out of a liquor store robbery during which defendant shot and killed two people. The prosecutor sought the death penalty against defendant but not Miller. Defendant pleaded guilty to the first degree murders of Heather Mattia and Firas Eiso under the special circumstances of multiple murder and murder in the course of a robbery. He admitted enhancement allegations that he personally used a firearm during the commission of the murders and previously suffered certain felony convictions. Miller's guilt trial and defendant's penalty trial were held simultaneously before separate juries. Defendant's jury returned a verdict of death. The court denied the automatic motion to modify the verdict and imposed a judgment of death. This appeal is automatic. We affirm the judgment.

# I. THE FACTS

## A. Overview

In March 2006, defendant and Miller robbed a liquor store, ordering the two victims to lie on the floor. As Miller was leaving the store, defendant fatally shot both victims in the back of the head. Much of what occurred during the robbery, although not the actual shooting, was captured on videotape that was played to the jury. The prosecution also presented evidence of defendant's other criminal conduct involving force or violence.

Defendant presented substantial evidence in mitigation, largely focusing on his unfortunate childhood and how it contributed to his criminal behavior.

## B. The Liquor Store Robbery

On March 1, 2006, shortly after 11:00 p.m., Heather Mattia, the co-owner of the Granada Liquor store in El Cajon, and her employee, Firas Eiso, walked out of the store after closing it for the night. Defendant and Miller confronted them outside and forced them back into the store. Miller wore gloves and a mask; defendant wore gloves but no mask.

Inside the store, Mattia and Eiso were ordered to lie on the floor and forced to crawl in front of the counter. Miller, holding a bag, went behind the counter. A short time later, Miller left the store. As Miller was leaving, defendant shot both victims in the back of the head while they were lying on the floor. Defendant then left the store, gun in hand, joined Miller, and they drove away. Just under four minutes elapsed from the time the victims were forced back into the store until defendant left the store.

The bodies, lying facedown side by side in pools of blood, were soon discovered. Police found two nine-millimeter bullet casings nearby. A bullet was found under Eiso's body. A second bullet was found in a stack of beverage cans,

2

where it had come to rest after ricocheting around. The drawers to some cash registers had been pulled out.

Both Mattia and Eiso died of a single gunshot wound through the head. Mattia also suffered grazing wounds to her forearm, finger, and hand, probably caused by the same bullet after it passed through her head. The condition of Mattia's lungs indicated she was still breathing for about 15-20 minutes after she was shot. Her head wound was such that the body might have twitched involuntarily until she died. The autopsy revealed no indications of a struggle.

The parties stipulated that if called as witnesses, Rodney Hodges and Dwayne Hooks — defendant's cohorts in later crimes — as well as Debbie Mays, would testify that, on separate occasions, defendant told each of them that he had shot two people in the head during the liquor store robbery, and the legs of the female victim twitched after he shot her.

Miller testified on his own behalf. Most, although not all, of his testimony was in front of defendant's penalty jury as well as Miller's guilt jury. On the night of the robbery, he rode to the liquor store with defendant and Nichele Hopson, who drove. Miller was just going along for the ride and thought they were going to buy something to drink. When he and defendant got out of the car, defendant pulled out a gun, tossed Miller a bag, and told him they were going to do a robbery. Miller was "scared out of [his] wits." Because defendant had a firearm, Miller felt he had no choice but to do as he was directed. Inside the bag were gloves and a mask, which defendant told him to put on. Defendant then told Miller to follow him into the store.

When Miller stepped into the store, he saw Mattia and Eiso lying on the floor. Defendant was still holding the gun. Following defendant's orders, Miller took money from the cash register, which he put into the bag. The victims were cooperating and saying things like, "Just take the money, leave me alone." Mattia

3

told them where the money was.  After Miller took the money, defendant told him to leave the store, which he did.  Miller did not hear any shots, but Hopson told him she heard some.  Then defendant got into the car and told Hopson to drive away.

The prosecution cross-examined Miller about his prior statements — in which he confessed to his involvement in the crime and did not implicate defendant in the manner he did at trial — and impeached him with a friendly letter he wrote to defendant in jail after his arrest.  Miller also acknowledged that he had previously told the police he heard Mattia say, "Please don't kill me.  I just want to be with my family"; and he heard Eiso begging for his life.  Miller testified he lied to the police and did not actually hear these statements.  He also testified that defendant never made threats to force him to participate in the robbery.

### C.  Defendant's Other Crimes

The prosecution presented evidence of defendant's felony convictions and other criminal conduct.

On February 10, 1999, defendant and another man robbed a Taco Bell restaurant in San Diego, netting about $150.  The manager testified she saw the butt of a gun in defendant's pocket.  Defendant admitted his involvement in the robbery.

On March 7, 1999, defendant and two others approached Paul Hillard while he was sitting in his car.  Wielding a gun, defendant ordered Hillard to get out of the car and lie on the ground.  One of the three took $304 from Hillard, and then they drove away in Hillard's car.  Police found defendant a short time later sitting in the front passenger seat of the car.  A gun was recovered from that seat, and defendant admitted he was the one holding the gun during the robbery.

4

On July 28, 2006, defendant and Rodney Hodges unsuccessfully attempted to rob a Bank of America branch in El Cajon. During the attempt, defendant fired two shots with a handgun.

On July 31, 2006, defendant, armed with a handgun, and Dwayne Hooks robbed a Washington Mutual Bank branch in Lakeside. Defendant pointed the handgun close to a teller's head, ordered her to unlock a cash drawer, and then ordered her to lie on the floor. During the robbery, defendant dropped some keys that were later identified as those given to him before the robbery. Defendant and Hooks left the bank with about $25,000 in cash. Unbeknownst to them, however, the cash contained a "dye pack," which activates when it is taken through the sensors on the bank doors. While defendant and Hooks were driving away, the pack exploded, sending red dye and tear gas into the car's interior. Defendant's saliva was later found mixed with the dye on the surface of the getaway car.

On January 12, 2008, while in jail, defendant and other inmates assaulted another inmate. On May 29, 2008, defendant and another inmate assaulted a different inmate, who suffered "minor injuries" as a result.

On August 8, 2008, defendant assaulted Deputy Sheriff James Clements, slicing him with a razor blade. Clements needed ten stitches and four staples to close head wounds, and suffered other lacerations. When asked later whether he was injured, defendant said he was not and added, "But I blasted your cop."

On August 11, 2008, correctional officers found a piece of metal that "was started to be sharpened" in the waistband of defendant's pants. The next day, while being transported for medical treatment, defendant threatened jail deputies, including threats of "gassing" — or "throwing urine or feces on" — correctional personnel.

The parties stipulated that defendant suffered the following felony convictions: a 1999 conviction for robbing Hillard while armed with a firearm; a

2000 conviction for possession of cocaine base for sale; a 2001 conviction for possession of a deadly weapon while incarcerated in prison; a conviction for the July 28, 2006, attempted robbery of the Bank of America while armed with a firearm; a conviction for the July 31, 2006, robbery of the Washington Mutual Bank while armed with a firearm; and a conviction for the attempted murder of Deputy Clements, a peace officer, and the infliction of great bodily injury. He was in custody on these matters from March 8, 1999, to December 3, 1999, from November 16, 2000, to October 1, 2005, and after August 23, 2006.

### D. Defense Evidence

Defendant presented several witnesses in mitigation who said his mother was a prostitute addicted to PCP, and his father was her pimp. His father was absent from his life and played no role in raising him. His mother was neglectful and unaffectionate, and she abandoned him at a Jack in the Box restaurant when he was five years old. After that, he was raised by relatives or was shuttled through several placements, including a group home.

Dr. Rahn Minagawa, a forensic psychologist, described defendant's childhood as "pretty horrendous." In his opinion, defendant should have received therapy or other professional intervention at various times during his early childhood. In addition, defendant's "gang membership," beginning at an early age, was a negative influence that contributed to his criminal behavior.

Barbara Duey, an attorney with the Children's Law Center of Los Angeles, testified that, although defendant received therapy when he was 13 and 14 years old, he should have received it earlier when he most needed it.

Daniel Vasquez, a former warden at San Quentin State Prison, reviewed defendant's prison records. Defendant was imprisoned between 2000 and 2005,

6

but his only assaultive conduct during that time was one act of mutual combat. There were no assaults against prison staff.

## II. DISCUSSION

### A. Pretrial Issues Regarding Defendant's Representation

Two attorneys represented defendant at trial: Mark Chambers and William Wolfe. Defendant raises several issues regarding Chambers's representation.

#### 1. Factual Background

The court originally appointed the public defender's office to represent defendant. On March 21, 2007, that office declared a conflict. Acting through San Diego County's "Private Conflicts Counsel," the court appointed Chambers to represent defendant. When the court asked whether Chambers was "on the list of class six attorneys by and through Private Conflicts Counsel," Chambers said he was. According to a document filed with the trial court on January 23, 2008, Chambers was to receive a total fee of $137,000 through the end of trial. He had already received $17,000, was to receive $40,000 "forthwith" (that is, as of January 23, 2008), and was to receive $40,000 at the commencement of hearings on pretrial motions and the final $40,000 after the jury was impaneled. When Chambers was first appointed, the district attorney had not yet decided whether to seek the death penalty against defendant. On November 7, 2007, the district attorney announced the intent to seek the death penalty, and the court appointed Wolfe to assist Chambers in the defense.

On December 13, 2007, attorneys Patricia Robinson and Sandra Resnick, representing San Diego County's Private Conflicts Counsel, appeared in court to argue that Chambers was not qualified to defend a death penalty case. At their request, the court held a hearing outside the prosecutor's presence.

Robinson told the court that Chambers was a class five, not class six, attorney. The Private Conflicts Counsel's "capital case committee" believed that a class five attorney could act as "second chair," but not "first chair," in defending a capital case. Resnick suggested the court appoint an independent attorney to advise defendant "about what his options are and what all of this means." Chambers responded that he had been representing defendant for several months, including during the preliminary hearing. He said he met the qualifications to defend a capital case provided in the California Rules of Court, rule 4.117, and the guidelines established by the American Bar Association (ABA). He had established a working relationship with Wolfe, who was acting as second chair. He did not want to act as second chair in the case.

In responding to Chambers's representations, Resnick did not mention the California rules, but she implicitly agreed that Chambers's qualifications satisfied the ABA guidelines. She said that Chambers had only acted as advisory counsel in one capital case and standby counsel in another. The Private Conflicts Counsel's own guidelines required that an attorney act at least as a second chair in a capital case before acting as first chair.

Chambers said he had been involved in two capital cases, one the "*Michaels*" case. (See *People v. Michaels* (2002) 28 Cal.4th 486.) In the *Michaels* case, he explained, the defendant technically represented himself but he, Chambers, actually tried the entire case: "I selected the jury, I did the opening, I examined all of the witnesses, I did the closing, and I argued the motions they previously drafted. Mr. Michaels really didn't participate in the trial other than be there." He added that he had defended "at least 30 first degree homicide cases in this county." Later, he added that the Private Conflicts Counsel had originally considered him to be a "class six" attorney. Robinson agreed with this statement

8

but said that more recently the organization had reevaluated matters and now Chambers was "approved for class five."

Defendant asked to speak. He said, "I don't need no advisory," he did not "need to talk to anybody," and "I don't want to speak with another attorney. I already heard everything that's going on. I don't need to talk with him." He said he wanted to keep Chambers as his attorney because he had "built a relationship" with him. He believed that getting another new attorney at that stage "was going to be real bad to my case. If I have to start all over with another lawyer, then that's going to be a time period that I'm losing ground." He went into detail. He pointed out that a new attorney would not have done the preliminary hearing, and if the court "threw him in the case," he would not "know what's going on," and would have "no relationship. Nothing."

The court ultimately continued the matter and appointed Attorney Donald Levine to speak with defendant about the situation. The next hearing was held on January 11, 2008, with Levine present. At first, the hearing was held in the prosecutor's presence. The court asked the deputy district attorney to leave the courtroom, as the hearing would be a "sealed proceeding." Before she left, she said she did not know what role Levine had in defendant's case. But she informed the court and defendant that Levine had represented a person who had information in the case and was willing to cooperate. She said Levine "was involved in conversations with this person wanting to come forward to provide testimony against Mr. Rices. Given that information, I don't know what the court's position is on having Mr. Levine being involved in possibly defending Mr. Rices." At that point, the prosecutor left the courtroom and the hearing proceeded in her absence.

Levine said he had reviewed the materials and then spoke in private with defendant. He "did not inquire as to any specifics as to this case," but he discussed with defendant capital case procedures, including the fact that Chambers

9

was "technically not . . . qualified, according to the Private Conflicts Counsel guidelines." He inquired whether defendant "was satisfied with his current representation." He said that "basically, Mr. Rices indicated that although there may have been some difficulties early on between himself and Mr. Chambers that they have ironed those out. That he believes that Mr. Chambers is working in his best interest. In fact, that he believes that Mr. Chambers has developed a rapport with the witnesses in this case, which Mr. Rices stressed was hard to do . . . . And it would not be in Mr. Rices's best interest if Mr. Chambers was removed from this case. When I discussed with him the question of whether Mr. Chambers qualified, technically, according to the [Private Conflicts Counsel] guidelines, Mr. Rices felt that Mr. Chambers was sufficiently qualified to handle his case, both through the guilt and penalty phase and he is satisfied with his representation." Levine believed that defendant understood the situation and found him to be "articulate [and] intelligent." Defendant "would object to Mr. Chambers being relieved as counsel" and, "in fact, he would request to go pro per if that were to occur."

Defendant then asked why the court "sen[t] somebody to me that represented a confidential informant or a cooperating witness?" The court responded that it did not know about any involvement Levine may have had in the case. It offered to appoint another lawyer to speak with defendant. Defendant said, "No. I don't believe I would like that." When he asked again why Levine had been appointed, the court explained that it had not known of any conflict, and that it knew very little about the case. It again offered to appoint another attorney to speak with him if he would prefer. Defendant said, "No, I don't prefer it." When the court inquired, defendant said he wanted to keep both Chambers and Wolfe as his attorneys.

The court then reaffirmed the appointment of Chambers and Wolfe as defendant's attorneys: "The court has examined the transcript, considered the guidelines, considered the comments of Mr. Levine, who was appointed to counsel independently with Mr. Rices, regarding what a capital case is, what a capital attorney does for a client, how the case is managed or handled, and Mr. Rices has desired to retain this particular defense team, which desire has been stated to me on two separate occasions, a month apart. It appears to me, upon also reviewing this transcript, that the qualifications of both Mr. Chambers and Mr. Wolfe are more than adequate to handle this case, based upon their rendition of their personal and professional experience in this area and giving heavy consideration as well to Mr. Rices's desire."

On April 29, 2008, defendant told the court he wanted a "*Marsden*" hearing. (*People v. Marsden* (1970) 2 Cal.3d 118.) The court conducted the hearing outside the presence of the prosecutors. (The hearing was thus conducted after defendant's January 12, 2008, assault on a jail inmate, and before his May 29, 2008, assault on another inmate and his August 8, 2008, assault on Deputy Clements.)

Defendant told the court he wanted to "fire him . . . because I can't work with him." At that point, defendant did not specifically state whether he meant Chambers or Wolfe, but as the hearing progressed it became clear he was referring to Chambers. He said he had given Chambers information about his mental state, but Chambers was not taking him seriously. He had originally "brought it to the Sheriff's attention, Deputy Rodriguez. I told him that I was . . . hearing voices . . . in my head. I told him I needed some . . . psych detention [*sic*; perhaps meaning "attention"] . . . ." When Rodriguez asked him what was going on, defendant told him, "I couldn't tell him what the voices was in my head because it was inappropriate for me to tell him."

11

Defendant said the voices were "telling me to kill people," "to slice people's throats open." "I would actually see me doing it . . . out of nowhere for no reason. And it was certain things that was going on in the county jail where I was doing things and I didn't remember I was doing them. Like being violent towards people. And it was a couple of incidents that happened where some inmates that came to me and like man, you know, you did this and you did that, and I didn't remember what I was doing. So I knew something was wrong." He felt he could not tell a deputy because "that could be used against me . . . . Probably for my case, they tell the D.A. that I'm going around killing people."

Defendant told the court that he spoke with Chambers about the situation, and then "he goes and tells the deputies that I want to kill somebody or was attempting to kill myself." Defendant felt that Chambers's doing so violated the attorney-client privilege. He explained, "I agreed for him to tell the watch commander that I needed to see the psych, but I didn't agree for him to disclose information of why I needed to see the psych. And Deputy Rodriguez came and told me specifically that they were going to put me in the rubber room because my attorney had told the watch commander that I feel like being violent towards other people. And that's not what I told him. I told him I had been feeling like that the past couple of weeks. I didn't tell him I was feeling like that at that present time. It spurts in and out."

Defendant said he explained to Chambers that he had not been "in my right mind lately. I haven't been able to do nothing. I really can't help you right now in the case. I was really trying to explain that to him and really let him know, but he seemed to feel like I'd been joking with him or playing . . . some kind of game." He reiterated that he had "a problem with voices in my head. Things going on. Just because I look all right doesn't mean I'm all right. And I'm trying to stress to him that point."

12

The court then asked Chambers whether defendant had been examined earlier in the case. Chambers said that once, before he entered the case, defendant "had a 1368 episode."[1] At that point, "Dr. Solvang" evaluated him. Chambers had received that evaluation when he spoke with defendant. Chambers confirmed to the court that defendant had told him essentially what defendant had just represented. "Between Mr. Rices and myself, it was decided since he had already requested to see the mental health provider doctor at the detention facility, that I would contact the staff there and attempt to move that meeting up. So when I left there, I called the watch commander and lieutenant and told the lieutenant, as Mr. Rices had agreed, that he had the potential of acting out, was the descriptive phrase that I used to the watch commander."

Defendant interjected that he "never agreed to that." The court said it would let defendant have the final word, then Chambers continued. Chambers said that "based upon that, they apparently saw him that afternoon." He added, "One of the other things that Mr. Rices and I discussed was the acquiring funding and getting a defense psychologist . . . because we didn't really have one to fit in that slot at this point." He said that a funding motion had been filed the previous day.

Defendant responded that "just because I ain't going around doing stupid stuff don't mean that I don't got problems. I'm trying to explain to him. I told him I can't even read, I can't even write right now. . . . I can barely function inside the unit I'm in because of the voices inside my head right now."

The court denied defendant's *Marsden* motion: "I've listened to your request and I appreciate how you've presented it. It appears to me that at the

---

[1] In this context, Chambers was likely referring to Penal Code section 1368, which addresses the procedure to follow when a judge doubts a defendant's mental competence.

present time, you're tracking real well. You're a very articulate individual. I've reviewed the work that Mr. Chambers has performed on your behalf. I do not believe there is grounds for granting your request to relieve your attorney. And I'm going to indicate that Mr. Chambers has stated that there is a funding request that has been recently made. This issue can obviously be placed before the court at a future time."

At that point defendant said he wanted to represent himself because he did not trust his lawyer. The court scheduled a hearing on that motion for a later date. At the next hearing, after the speaking with his attorneys, defendant told the court he no longer wished to represent himself.

Chambers and Wolfe continued to represent defendant from that point on.

### 2. *Alleged Conflict of Advisory Counsel*

Defendant argues that when the prosecutor informed the court Levine had represented someone else involved in the case, the court should have held a further hearing regarding the possible conflict and, if a conflict existed, appointed a second independent counsel. However, defendant declined a second independent counsel and did not even want the first. In any event, contrary to the Private Conflicts Counsel's assertions, Chambers was fully qualified to represent defendant.

At the hearing, Chambers stated that he was qualified to defend a capital case under both California's standards for appointment of capital counsel (Cal. Rules of Court, rule 4.117) and the ABA guidelines. The attorneys from the Private Conflicts Counsel agreed, at least implicitly, that he was qualified under those standards, but they claimed Chambers was unqualified under their own, separate, guidelines, which required attorneys to have acted as second chair before they could act as first chair in a capital case. We have said that the ABA

14

guidelines do not establish the standards for effective representation. (*People v. Williams* (2013) 56 Cal.4th 630, 692.) But it appears Chambers met those standards. Any failure to satisfy the Private Conflicts Counsel's own standards did not render Chambers unqualified to represent defendant.

Moreover, it appears that Chambers satisfied even the Private Conflicts Counsel's standards. He had previously been involved in two capital cases, including the "*Michaels*" case, in which he had effectively acted as *first* chair at trial even though the defendant technically represented himself. As stated in our opinion in that case, "Although defendant represented himself, with [Attorney Richard] Grossberg and Chambers as his advisory counsel, at trial Chambers, who initially had been second counsel, took on the role of lead counsel. Grossberg did not participate and defendant's participation was minimal. Whenever the judge asked defendant if he intended to participate, he replied that Chambers was his attorney and would represent him. Chambers conducted the voir dire, examined witnesses, and presented all arguments, both at the guilt phase and at the penalty phase." (*People v. Michaels*, *supra*, 28 Cal.4th at p. 521.) Thus, he acted as second chair until trial and as first chair at trial.

Even if we assume the court should have investigated a possible conflict of interest for Levine, defendant has not shown prejudice. "When a defendant claims that a trial court's inquiry into a potential conflict was inadequate, the defendant still must demonstrate the impact of the conflict on counsel's performance." (*People v. Cornwell* (2005) 37 Cal.4th 50, 78 [rejecting the argument that *Wood v. Georgia* (1981) 450 U.S. 261 required a different rule]; accord, *People v. Nguyen* (2015) 61 Cal.4th 1015, 1071.) "Absent a demonstration of prejudice, we will not remand to the trial court for further inquiry." (*Nguyen*, at p. 1072.) The court asked Levine only to inquire into whether defendant still wanted Chambers to represent him. Levine did not inquire into the case itself. The possible conflict

15

cannot have compromised this simple task.  Moreover, defendant said repeatedly he wanted Chambers to represent him despite the Private Conflicts Counsel's assertions, and he confirmed this desire after Levine told the court the results of his consultation with defendant.  We see no prejudice.

### 3.  Trial Counsel's Alleged Conflict of Interest

Based on what occurred at the April 29, 2008, *Marsden* hearing, defendant contends that Chambers acted under a conflict of interest, as he had to "choose between becoming a witness at trial or keeping the case as counsel."  He argues that once defendant told him about the voices he claimed to be hearing, Chambers was a potential witness because he could testify about what defendant had told him, either to support a mental defense or as mitigating evidence.  We disagree.

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.  This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)  "For both state and federal purposes, a claim of conflicted representation is one variety of claim that counsel provided ineffective assistance.  Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different. (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 (*Mickens*); *Doolin*, *supra*, at pp. 417-418, 421; see *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)" (*People v. Mai* (2013) 57 Cal.4th 986, 1009-1010.)

Determining "whether counsel's performance was 'adversely affected' . . . 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' (*People v. Cox* (2003) 30 Cal.4th 916, 948-949, italics omitted." (*Doolin*, *supra*, 45 Cal.4th at p. 418.) Prejudice is generally presumed "when defense counsel 'actively represented conflicting interests.' (*Mickens*, *supra*, 535 U.S. at p. 166.)" (*Doolin*, at p. 418, fn. omitted; but see *People v. Rundle* (2008) 43 Cal.4th 76, 172-173 [prejudice is not always presumed in cases of a claimed conflict of interest].)

Defendant contends the compensation agreement between Chambers and the court itself created a conflict. He notes that if Chambers had withdrawn from further representation due to the asserted conflict, he would not have received the bulk of the fixed fee. Thus, he argues, Chambers's own interests conflicted with his client's. We have rejected a similar argument regarding a fixed fee agreement despite the "theoretical possibility" that "under the agreement [the] lawyer could maximize his own compensation by cutting expenses for investigative and expert services." (*Doolin*, *supra*, 45 Cal.4th at p. 416.) Citing *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, we observed that most fee agreements may create a conflict. A flat fee could create an incentive to dispose of the case quickly, an hourly fee could create an incentive to drag the case out, and a contingent fee arrangement could create a conflict between the client's interest in obtaining the

17

largest possible recovery and the attorney's interest in obtaining a substantial fee with the least effort. (*Doolin*, at p. 416.) " ' "Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest." ' " (*Ibid*.) "[W]e assume attorneys are not so unethical as to neglect their clients' interests to advance their own. Any such obvious malfeasance is clearly the exception not the rule." (*Ibid*.) The mere existence of the fixed fee agreement does not entitle defendant to relief. (*Id*. at pp. 416-417.)

Defendant also argues a conflict existed even aside from the fee agreement. He notes that about a month after the *Marsden* hearing, he assaulted a jail inmate, and about two months after that, he assaulted Deputy Clements. He contends that Chambers could have testified about the alleged voices to support a mental defense regarding those assaults, but that Chambers presented no such defense. Accordingly, he argues that Chambers labored under a conflict of interest because he was a potential witness.

We rejected a similar contention in *People v. Dunkle* (2005) 36 Cal.4th 861 (*Dunkle*). In that case, "the penalty defense centered on defendant's current mental state, and counsel had testified during the second competency trial concerning the same subject matter." (*Id*. at p. 914.) The defense attorney "did not himself testify [at the penalty phase] despite his personal knowledge of facts supporting the penalty defense." (*Ibid*.) The defendant argued "that counsel was ethically obligated to withdraw from representing him and to testify as a witness in the penalty phase, thus generating a conflict between the obligation and his self-interest in maintaining employment on the case." (*Id*. at p. 915.)

In evaluating the argument, we explained that "[a]n attorney must withdraw from representation, absent the client's informed written consent, whenever he or she knows or should know he or she ought to be a material witness in the client's cause. (Rules Prof. Conduct, rule 5-210; see *Comden v. Superior Court* (1978) 20

18

Cal.3d 906, 911, fn. 1 [motion to disqualify opposing counsel].) The determination whether an attorney ought to testify ordinarily is based on an evaluation of all pertinent factors, including the significance of the matters to which the attorney might testify, the weight the testimony might have in resolving such matters, and the availability of other witnesses or documentary evidence by which these matters may be independently established. (*Comden*, *supra*, at p. 913.) An attorney should 'resolve any doubt in favor of preserving the integrity of his testimony and against his continued participation as trial counsel.' (*Id*. at p. 915.)" (*Dunkle*, *supra*, 36 Cal.4th at p. 915.)

In finding no conflict of interest in *Dunkle*, we explained that the defense attorney had "some unique personal knowledge, to which he testified during the competency trial, of the same general subject matter. He therefore could have given relevant testimony during the penalty phase. But [Penal Code] section 190.3, factor (k), permits the jury to consider a virtually unlimited range of mitigating evidence [citation], and trial counsel in every case has unique personal knowledge of the defendant that conceivably might be relevant or useful in the penalty phase. We have never suggested that counsel therefore must withdraw from penalty phase representation and testify on the defendant's behalf, and we reject any such implication now." (*Dunkle*, *supra*, 36 Cal.4th at p. 916.)

We similarly see no conflict requiring Chambers to withdraw from representation in this case. If a credible mental defense (or mitigating evidence) existed, and if defendant's claim to be hearing voices could significantly aid such a defense, the evidence was readily available in other forms than counsel's testimony. The sheriff's deputy to whom defendant spoke about his "voices," and to whom the attorney spoke later, could have presented evidence. More importantly, defendant could have said the same thing to a mental health expert examining him for a possible mental defense, and that expert could testify, as an

19

expert did in *Dunkle*, *supra*, 36 Cal.4th at pages 915 to 916. A mental health expert would be in a better position than a lay attorney to evaluate whether the voices were genuine or merely self-serving claims, and whether, in light of all the information at the expert's disposal, defendant had a valid mental defense and, if so, to credibly testify to that effect.

The record presents no basis to conclude that counsel pulled his punches despite any asserted conflict. As defendant argues, counsel presented no mental defense regarding the jail assaults. But he did present a vigorous penalty phase defense in mitigation, centering around defendant's horrendous childhood and the effect it had on his later criminal behavior. The record does not disclose why counsel did not additionally present a mental defense regarding the assaults. But it does reflect that counsel had the benefit of an earlier mental health expert's evaluation of defendant, and that he had requested funding to obtain the services of another mental health expert. We do not know the results of the funding request, but counsel may well have had tactical reasons to focus on defendant's childhood and its impact on him rather than present a mental defense based on the reported voices. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 418.) The experts might not have uncovered anything to support a credible mental defense. Counsel might also have been concerned that the jury would suspect the claimed voices were not genuine but merely a self-serving attempt to provide a defense for defendant's repeated violent behavior, which would detract from the defense that counsel did present. Accordingly, on this record, we find no basis to conclude that counsel should have withdrawn from representation when defendant told him about the voices.

Defendant also argues that counsel's informing the authorities about the reported voices exacerbated the conflict. He asserts that counsel properly informed the authorities of defendant's claims under Evidence Code section 956.5,

20

which provides that the attorney-client privilege does not exist "if the lawyer reasonably believes that disclosure of any confidential communication relating to representation of a client is necessary to prevent a criminal act that the lawyer reasonably believes is likely to result in the death of, or substantial bodily harm to, an individual." (See Rules Prof. Conduct, rule 3-100(B) [similar].) Then he asserts that providing such information against his client presented another conflict. But Chambers did not tell the authorities about the voices due to Evidence Code section 956.5. He said he did it with his client's permission to try to obtain mental health services for him. Indeed, defendant complained that Chambers did not seem to be taking his claim of hearing voices seriously enough.

Relying on *Wood v. Georgia*, *supra*, 450 U.S. 261, defendant also argues that at least the trial court should have conducted an additional inquiry when it learned of the asserted conflict. In deciding this question, "[w]e look to whether facts known to the trial court raised the possibility of a conflict of interest obliging it to inquire further." (*Dunkle*, *supra*, 36 Cal.4th at p. 916.) The court did inquire into whether Chambers had information about a possible mental defense. That inquiry was sufficient under the circumstances. As in *Dunkle*, at pages 915 to 916, counsel could easily have presented a mental defense through experts if a valid one existed. For essentially the same reasons we have rejected defendant's argument that counsel labored under a conflict of interest, "we do not believe the circumstances 'impose[d] upon the court a duty to inquire further' into the possibility of a conflict of interest. (*Wood*, *supra*, 450 U.S. at p. 272.)" (*People v. Rundle*, *supra*, 43 Cal.4th at p. 176.) For similar reasons, we also reject defendant's related argument that the trial court had to inquire into a possible conflict months after the *Marsden* hearing, when it learned that the prosecution intended to proffer in aggravation evidence of defendant's later assaults, and his

21

claim that these circumstances violated his Eighth Amendment right "to a fair and reliable penalty determination."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1044.)

### 4.  *Denial of* Marsden *Motion*

Defendant argues the trial court should have granted defendant's *Marsden* motion "after learning that counsel had, in apparent compliance with Rule of Professional Conduct 3-100(B)," reported to jail authorities that defendant was hearing voices.  Once again, counsel did not report what defendant had told him to comply with that rule, but to try to obtain mental health services for defendant.  To the extent defendant contends the court had to grant his motion because he said he could not work with or trust Chambers due to Chambers's revealing what defendant had said about the voices, we disagree.

"When a defendant seeks to obtain a new court-appointed counsel on the basis of inadequate representation, the court must permit him or her to explain the basis of [the] contention and to relate specific instances of inadequate performance.  The court must appoint a new attorney if the record clearly shows the current attorney is not providing adequate representation or that the defendant and counsel have such an irreconcilable conflict that ineffective representation is likely to result.  [Citations.]  If the court holds an adequate hearing, its ruling is reviewed for abuse of discretion."  (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623.)

We see no abuse of discretion.  The court held a full hearing and permitted defendant to states his reasons for wanting a new attorney.  Chambers had informed the authorities of defendant's claimed voices with, he stated, defendant's consent, to try to obtain mental health services for defendant.  Defendant disagreed regarding the exact scope of his agreeing to Chambers's telling the authorities.  But, "[t]o the extent there was a credibility question between defendant and

counsel at the hearing, the court was 'entitled to accept counsel's explanation.' " (*People v. Smith* (1993) 6 Cal.4th 684, 696, quoting *People v. Webster* (1991) 54 Cal.3d 411, 436.)

### B. Change of Venue

Defendant contends the trial court prejudicially erred in denying his motion to change venue. It did not.

#### 1. Factual Background

On June 16, 2008, defendant moved to change venue from San Diego County or, in the alternative, to transfer the trial from the East County judicial district to another judicial district within the county. He attached to the motion voluminous copies of media accounts of the crime and his later arrest. He also cited the results of a public opinion poll that showed that 70 percent of those surveyed in the East County judicial district had heard of the case, that of those who had heard of the case, 28 percent said they believed defendant was guilty, and that, of those 28 percent who believed defendant guilty, 22 percent said they would be biased against defendant. The percentages were smaller for other judicial districts in San Diego County. Defendant also argued that the victims were "Chaldean, Catholics of Iraqi descent," and that a "large Chaldean community" exists within San Diego County, concentrated in the East County district.

The motion was heard on November 17, 2008. The court stated that it had considered the possibility of drawing the jury venire equally from the entire county and not just within the East County district. It discussed the logistics with the jury commissioner. But drawing equally from the entire county was not feasible because prospective jurors were allowed to report to whichever court within the county was the most convenient to them.

23

At the end of the hearing, the court denied the motion without prejudice to renewal during jury selection. It agreed that the case had "received extensive pretrial news coverage," but found it was not "necessarily sensational or inflammatory. There has not been what we call a 'drum beat' of continued publicity regarding the trial. . . . [T]here was extensive coverage of a very unusual level of grief that the murders provoked within a very close-knit East County community. We call it our Chaldean community. The coverage of this community reaction was very extensive, but it also appeared to be straightforward in the sense of covering what actually happened. I'm unaware of any coverage regarding this outpouring of grief that was, in fact, sensational or calculated to inflame additional community reaction."

The court noted that the public opinion survey, although showing greater awareness of the case within the East County than other parts of the county, showed that most prospective jurors from East County would not "have firm attitudes about the case." It also noted that the jury would not be called on to decide guilt, as that had already been established. It believed that the issue of guilt "is the one that's most vulnerable to pretrial publicity. The fear that pretrial coverage of an arrest of a suspect or suspects leaves prospective jurors with an impression that the police have the right person is no longer an obstacle in this case to a fair trial . . . ."

Regarding the size of the community, the court estimated that about 500,000 people live in the East County district. Because of the policy permitting prospective jurors to report to whichever court within the county they chose, the court also believed that some of those who reported to the East County would come from other parts of the county. It noted that, before the crimes, defendant "had no special prominence or notoriety in the East County." It found that the nature of the news coverage "did not create an image of Mr. Rices wherein East

24

County residents would find Mr. Rices a particularly loathsome or threatening individual. I believe the news coverage was essentially the type of news coverage that could be expected in a case that alleged double murders."

Regarding the victims, the court stated that "apparently the victims' youth and Chaldean heritage triggered a very extraordinary degree of sympathy and grief in the East District's Chaldean community. This outpouring of emotion was covered by both print and electronic media. I find that this Chaldean community is obviously a very vital and significant element of East County society and culture." But it found that that community constituted only a small part of the East County population. "So this is part of my findings as to the status of the victims, that the community of Chaldeans is obviously important; it's not sizeable; the victims were members of that community; and they became prominent as a result of the crimes and the mourning that occurred post-crime. Before that, they were not highly visible or prominent members of either the East County or the Chaldean community."

The court concluded that "the size of the population, together with those survey results, suggest strongly that a fair and impartial jury can be selected from an East County draw."

On May 27, 2009, during jury selection, defendant renewed the motion to change venue. The court denied the renewed motion: "I did carefully review question 79 on the questionnaire, which is the question, 'Based upon what you know, have read, or heard about this case, is there any reason why you cannot or should not be a juror in this case?' I could be wrong. There could have been a handful of people who indicated 'yes,' but my recollection is it was almost uniformly 'no.' Even those who indicated they have heard or read something, most of those responses then referred to 'I know about what you've revealed in

25

your introduction to the case, that there was the robbery, the two murders.'[2]  And I do not feel that in any sense the pool of prospective jurors were tainted by publicity in any fashion.  Most of them said vaguely, 'I remember something, but it's been three years.'  Therefore, the renewed motion for a change of venue is denied."

### 2. *Analysis*

"On a defendant's motion, the court must order a change of venue 'when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.'  ([Pen. Code] § 1033, subd. (a); see *People v. Famalaro* (2011) 52 Cal.4th 1, 21.)  On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county.  In deciding whether to change venue, the trial court, and this court in its independent review, considers several factors, including the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the defendant's status within the community, and the victim's prominence.  On appeal, a defendant challenging the court's denial of a change of venue must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a

---

[2]    The jury questionnaire that all prospective jurors in defendant's penalty trial were asked to fill out informed them about the case as follows:  "This case involves a robbery and shooting that occurred at the Granada Liquor Store in El Cajon on March 1, 2006.  Ms. Heather Mattia, the liquor store co-owner, and her employee, Mr. Firas Eiso, were fatally shot in the back of the head.  Both victims were members of the Chaldean community.  Two individuals, Jean Pierre Rices and Anthony Miller, were arrested and charged with the murders in November 2006.  The defendant in this case, Jean Pierre Rices, recently pled guilty to the killings."

fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial." (*People v. Rountree* (2013) 56 Cal.4th 823, 837 (*Rountree*).)

Contrary to defendant's argument, this is not one of the "extreme case[s]" in which prejudice is presumed. (*Skilling v. United States* (2010) 561 U.S. 358, 381 [prejudice was not presumed despite pervasive publicity from the Enron scandal].) Indeed, this case is nothing like the cases in which the high court has presumed prejudice. (See generally *People v. Avila* (2014) 59 Cal.4th 496, 509-510 (*Avila*).) "There was no circus or carnival atmosphere, no spectacular confession repeatedly televised in a small community and seen by three actual jurors. Although there was indeed much publicity about this case, especially around the time of the crime, that alone did not make this such an extreme case." (*Id*. at p. 510.)

The charged offenses are obviously the most serious, but that circumstance does not alone compel a change of venue. (*Rountree*, *supra*, 56 Cal.4th at pp. 837-838.) This is especially true given that defendant pleaded guilty to those crimes. "As the trial court recognized, neither the size of the community, nor defendant's status within the community, nor the victim's prominence supported a change of venue." (*Avila*, *supra*, 59 Cal.4th at p. 507.) "Although there was an understandable outpouring of sympathy for the victims immediately after the crime, they had no particular celebrity status in the community." (*People v. Edwards* (1991) 54 Cal.3d 787, 807-808.) As defendant argues, and the trial court noted, the victims were members of the close-knit Chaldean community in the East County district, and that community, understandably, grieved heavily over its loss. But even assuming what we should not assume — that members of the Chaldean community could not provide defendant a fair trial — that community constituted only a small portion of the large overall population in the East County

27

district. The victims' ethnicity did not establish that a fair trial could not be had in the East County district.

As defendant stresses, the publicity was at times heavy, as is to be expected of a crime of this nature. But the record supports the trial court's finding that it was not so inflammatory as to preclude a fair trial. Defendant notes that much of the publicity described the crimes as execution-style murders or the like. Defendant cites portions culled from the voluminous record that described the crimes as "brutal," "cold-blooded," "evil," "horrible," or "horrific." One newspaper account quoted a man as saying that the perpetrator "is a coward, an animal," and other accounts suggested the perpetrator was dangerous or without a conscience. But these descriptions, selected from generally factual and noninflammatory reporting, are not by themselves necessarily prejudicial. Defendant's guilt was established by the time the trial began, and any actual juror would learn soon enough that the murders were, indeed, execution style, and that the other words aptly described them. Defendant argues that some of the publicity mentioned circumstances, such as his supposedly bragging about the murders, that were not presented at trial. But that alone did not taint the entire venire. " '[P]retrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.' " (*Skilling v. United States*, *supra*, 561 U.S. at p. 384.) "As a whole, the publicity, while a cause for concern, was far less pervasive and potentially prejudicial than, for example, that in *People v. Leonard* (2007) 40 Cal.4th 1370, 1395, which we described as 'sensational and extensive.' " (*Rountree*, *supra*, 56 Cal.4th at p. 838.)

Moreover, over three years elapsed between the time of the crime and the trial, and about two and a half years between defendant's arrest for the murders and the trial. Most of the publicity occurred around the time of the crimes or defendant's arrest. This lengthy passage of time blunted the publicity's prejudicial

28

impact. (*Rountree*, *supra*, 56 Cal.4th at p. 838.) The publicity did not itself establish that the East County district could not provide a fair trial.

Defendant also relies in part on the public opinion poll. But the poll supports denial of a change of venue. Conducted long before the trial, it showed that at the time of the poll, some 70 percent of the East District population had heard of the case. But of that 70 percent, only 28 percent, meaning about 20 percent of the total population, said they believed defendant was guilty, and only 22 percent of those, meaning about four to five percent of the total population, said they would be biased. These are far lower numbers than those in other cases in which we have upheld the denial of a change of venue. (See *Rountree*, *supra*, 56 Cal.4th at pp. 838-839 [surveying cases].) Moreover, as the trial court noted, a belief that defendant was guilty was not necessarily prejudicial. The jurors were not called on to decide defendant's guilt. It was already established that he was guilty.

For these reasons, we find no error, that is, no reasonable likelihood defendant could not receive a fair trial in the East County district at the time he moved for a change of venue. He has also shown no prejudice. He "has not shown that it is reasonably likely he did not in fact receive a fair trial." (*Avila*, *supra*, 59 Cal.4th at p. 508.)

In trying to show prejudice, defendant notes that most of the prospective jurors who reported for duty did live within the East County district. But that does not show the trial was unfair. In fact, as the trial court found when it denied the renewed motion to change venue, the court and parties had little difficulty finding a jury untainted by the publicity. And the trial court was in the best position to judge the matter. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her

29

evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.' " (*Skilling v. United States*, *supra*, 561 U.S. at p. 386.)

Of the 12 actual jurors, five had neither heard of nor discussed the case. The others had heard of the case only vaguely, and there is no indication any remembered more about it than what they were informed in court. None indicated they remembered an arrest being made. Only two said they had ever discussed the case, and those only briefly and generally. None had an opinion regarding defendant based on anything he or she had heard outside of the courtroom. Two jurors did express an opinion that was obviously based on what they had been informed about the case. One juror, who had never previously heard of the case, said of defendant, "He is a murderer who must have had a bad childhood with lots of violence and alcohol and drugs." The second said she had no opinion of defendant "other than he sounds obviously violent and without regard for human life." All of the jurors stated there was no reason they should not be jurors in the case. The answers of the alternative jurors showed similarly little acquaintance with the case.

Trying to show he could not or did not receive a fair trial, defendant cites three particularly inflammatory opinions in the questionnaires from prospective jurors (who did not become actual jurors) expressing the view that defendant should either be killed, "fried," or hanged. Given the horrendous nature of the crimes, such opinions could undoubtedly be found in any community, not just the East County portion of San Diego County. The fact that a few prospective jurors, out of 242 who filled out questionnaires, expressed such opinions does not show that defendant could not or did not receive a fair trial in the East County judicial district.

None of the actual jurors had a preexisting opinion about the case. "Although a preexisting opinion is not disqualifying if the juror can set the opinion

30

aside and decide the case solely on the evidence presented in court [citation], these jurors did not even present that issue." (*Avila*, *supra*, 59 Cal.4th at p. 512.) Accordingly, "[t]his record presents no reason to find a reasonable likelihood that defendant did not receive a fair trial before impartial jurors." (*Id.* at p. 513.) We find neither error nor prejudice.

## C. Jury Selection Issues

Defendant contends the court committed several errors during jury selection.

### 1. *Denial of Challenges for Cause*

Defendant contends the court erred in denying his challenge for cause as to three prospective jurors, V.B., T.T., and L.M.

Preliminarily, the Attorney General contends defendant has not preserved the issue for appellate review. To preserve a contention that the court erred in denying a challenge for cause to a prospective juror, the defendant must (1) exercise a peremptory challenge to remove that prospective juror, (2) exhaust all peremptory challenges or somehow justify the failure to do so, and (3) express dissatisfaction with the jury that is ultimately selected. (*People v. Souza* (2012) 54 Cal.4th 90, 130; *People v. Mills* (2010) 48 Cal.4th 158, 186-187 & fn. 8.) Defendant did exercise peremptory challenges to all three of the jurors in question, and he did exhaust his peremptory challenges. But the Attorney General argues he did not express dissatisfaction with the final jury. We disagree. Before the jury was finally selected, defendant moved for the court to reconsider the denial of his challenges for cause or, in the alternative, for additional peremptory challenges. The court denied the motion. Later, *after* the jury was selected and the court was about to begin selecting alternate jurors, defendant again renewed the motion for more peremptory challenges, which the court again denied. Although defense

31

counsel did not say the precise words, "I am dissatisfied with the jury," the action of requesting additional peremptory challenges after the jury had been selected effectively expressed that dissatisfaction. We have never required any specific wording, just an expression of dissatisfaction. The claim is cognizable.

However, defendant has not shown prejudice even if we assume the court should have removed those prospective jurors. " 'So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.' (*Ross v. Oklahoma* (1988) 487 U.S. 81, 88; see *People v. Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4 [finding the high court's reasoning in *Ross* persuasive and 'applicable to the state constitutional analogues to the federal constitutional rights' to due process and an impartial jury considered in *Ross*].)" (*People v. Edwards* (2013) 57 Cal.4th 658, 753.) "While the claim is thus properly before us, we may reject it without examining the merits of defendant's challenges for cause because defendant cannot show prejudice." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 (*Yeoman*).) To prevail, "defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury," that is, that an incompetent juror was forced on him. (*Ibid*.) We recently reaffirmed that "*Yeoman* sets forth the correct standard for a defendant to demonstrate prejudice after properly preserving a claim that the defense used peremptory challenges to cure a trial court's erroneous denial of one or more for-cause challenges." (*People v. Black* (2014) 58 Cal.4th 912, 920.)

Defendant argues that language in some of our cases had made it unclear at the time of trial what the rule regarding prejudice was and, therefore, it would be unfair to apply the rule stated in *Yeoman* to him. Those cases suggested in dicta that a defendant could additionally show prejudice by showing the desire to exercise additional peremptory challenges to some of the sitting jurors. (E.g., *People v. Blair* (2005) 36 Cal.4th 686, 742; *People v. Bittaker* (1989) 48 Cal.3d

32

1046, 1087.) "But we have never reversed a case based on *Bittaker*'s dictum. [Citation.] We therefore reject the *Bittaker* dictum in our own cases that cite it, and now conclude that it has no applicability in a determination whether a defendant has been prejudiced by a denial of a for-cause challenge." (*People v. Black*, *supra*, 58 Cal.4th at p. 919.) Any uncertainty dicta in other cases might have caused does not preclude applying our *holding* in *Yeoman, supra*, 31 Cal.4th 93, which predated the trial. Indeed, we applied that holding to the defendants in *Yeoman* and *Black* themselves.

Because of questions of reliance, in some cases, where it was unclear what a defendant had to do to preserve an appellate claim, we have made a newly announced rule regarding cognizability prospective only. (E.g., *People v. Scott* (1994) 9 Cal.4th 331, 357-358 [rule requiring an objection at sentencing].) Indeed, for this reason, the rule requiring the defendant to express dissatisfaction with the jury has been applied only to cases tried after 1994. (*People v. Mills*, *supra*, 48 Cal.4th at p. 187.) But cognizability is not the issue; we have found this claim cognizable. A defendant does not rely at trial on a rule regarding prejudice. Accordingly, we can fairly apply the *Yeoman* holding to this case.

Defendant does not demonstrate that any sitting juror was biased and should have been excused for cause. Accordingly, he has not shown prejudice even if we assume the court should have granted the challenges for cause to the three prospective jurors.

### 2. *Limitation on Voir Dire*

Defendant contends the trial court impermissibly curtailed voir dire of prospective jurors regarding their attitude towards the death penalty. The jury questionnaire explained the basic facts of the case to the prospective jurors. (See fn. 2, *ante*.) Additionally, the court advised the prospective jurors about the kinds

of mitigating and aggravating evidence they might be called on to consider, including whether the defendant had engaged in other violent criminal activity or had other felony convictions.

Defense counsel wanted to provide more specific information about defendant's convictions. He wanted to advise the prospective jurors about "the conviction of the two murders, the attempted murder, the conviction of the carjacking, the conviction of the shank in the prison." The court permitted defense counsel to go into defendant's two convictions for "premeditated murder," but not the specifics of the other convictions. It explained that the voir dire proceedings were "not opportunities to figure out which jurors are going to side with you based upon the evidence you can summarize and which jurors are going to be kind of against you. This kind of inquiry is to ensure that we have people who are open to both penalties, not based upon the specific evidence, but based upon a general assessment of their thinking, their principles." Later, when defendant renewed his request, the court again denied it. It said it would not allow counsel to seek "advisory opinions regarding evidence that's going to come into the case."

Defendant contends the court erred in not permitting him to specify the convictions in questioning the jurors. We disagree. The information given to the prospective jurors provided the parties ample opportunity to question them about their attitudes towards the death penalty in this case. "Death-qualification voir dire must avoid two extremes. It must not be so abstract that it fails to identify jurors whose death penalty views would prevent or substantially impair their performance as jurors. Likewise, it must not be so specific as to require prejudgment based on a summary of potential evidence. [Citation.] The court may not categorically prohibit inquiry into a subject 'likely to be of great significance to prospective jurors' in deciding penalty. [Citations.] However, the court 'has considerable discretion in determining the scope of voir dire' . . . ."

34

(*People v. Leon* (2015) 61 Cal.4th 569, 586.)  The defendant does not have the right to ask specific questions that might invite the prospective jurors to prejudge the issue based on evidence that might be presented, or to educate the jury on the case's facts.  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1120.)

Not allowing defense counsel to list the specific convictions came within the court's considerable discretion.  The jury knew much about the case, and the parties were able meaningfully to examine them on their views of the death penalty in light of this information.  Defense counsel could probe the prospective jurors' views as applied to the general facts of the case.  (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1120.)  Because counsel had the opportunity to inquire on the general subject, "refusal to include a particular question is not error."  (*People v. Leon*, *supra*, 61 Cal.4th at p. 587.)  The court's ruling "did not deprive the defendant of *all* opportunity to ascertain jurors' views on case-specific facts."  (*Ibid*.)  We see no error.

### 3. *Excusing a Prospective Juror Due to Her Views on the Death Penalty*

Defendant contends the court erred in excluding one prospective juror, H.W., due to her views on the death penalty.

"A prospective juror in a capital case may be excluded for cause if his or her views on capital punishment 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.)  Prospective jurors 'may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' (*Id*. at p. 425.)  Accordingly, 'deference must be paid to the trial judge who sees and hears the juror' and must determine whether the 'prospective juror would be unable to faithfully and impartially apply the law.' (*Id*. at p. 426.)  We apply this

35

standard to determine whether excusing a prospective juror in a capital case for cause based on the prospective juror's views on capital punishment violates the defendant's right to an impartial jury under article I, section 16 of the California Constitution.  [Citations.]

" ' "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." ' [Citation.]  ' "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting.  Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected.  Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' ' " (*People v. Souza*, *supra*, 54 Cal.4th at pp. 122-123; see *Uttecht v. Brown* (2007) 551 U.S. 1, 9, 20, 22.)

Applying these rules, we see no error.  H.W. stated on the jury questionnaire, "I am somewhat biased against the death penalty.  I think it's harsh & severe.  No going back."  She also said she would not automatically vote for life in prison.  During voir dire, she said, "I remember this robbery happening very well.  I kind of live near the community, and I remember seeing the funeral cars.  And I just have a very unsettling feeling in my stomach.  I do not feel I could make a fair assumption.  One — the girl that was shot shares the same first name as me, and we're about the same age, and it's just — I do not want the stress of having to make a verdict on her death."  She would find the decision difficult.  Later, H.W. said she could consider the death penalty as an option, but she also said, "I think it's a heavy burden."  She said she was "willing" to serve, but added, "I just don't know subconsciously if I have other beliefs."  She also said that

36

considering imposing the death penalty "would be stressful on me, and I don't know if I can make a fair assumption, but I would try."

The prosecutor challenged H.W. for cause, arguing that "it's almost an overall assessment of her ability to sit as a juror on this case as much as it is anything else." The court excused her. It stated, "In listening to her, watching her body language, it does appear to me she likewise would be substantially impaired in her ability to return a verdict of death."

This case presents a classic example of why we "owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 22.) H.W.'s answers were equivocal and somewhat contradictory. Even she questioned whether she could return a verdict of death. The trial court specifically referred to her body language, that is, her demeanor, in its ruling. In that situation, "[w]e defer to the trial court's evaluation of a prospective juror's state of mind." (*People v. Souza*, *supra*, 54 Cal.4th at p. 126.) Accordingly, we find no error.

Defendant also contends the standard of *Wainwright v. Witt*, *supra*, 469 U.S. 412, should be abandoned and, apparently, replaced with a new rule prohibiting the trial court from excusing prospective jurors due to their views on the death penalty. However, the United States Supreme Court developed that standard and has recently reiterated it. (*White v. Wheeler* (2015) __ U.S. __, __ [136 S.Ct. 456, 460].) If that standard is to be abandoned or modified, and death qualifying the jury prohibited, it is up to that court to do so. (*People v. Capistrano* (2014) 59 Cal.4th 830, 864.) Defendant suggests we should do so ourselves on independent state grounds. However, we have long adopted the *Witt* rule as also stating the standard under the California Constitution. (*People v. Souza*, *supra*, 54 Cal.4th at pp. 122-123; *People v. Ghent* (1987) 43 Cal.3d 739, 767 ["Because we think *Witt*'s review standard and underlying rationale make good sense, and

because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopt the *Witt* standard."].) We decline defendant's invitation to depart from that standard.

### D. Issues Regarding Miller's Testimony

Codefendant Miller testified on his own behalf during his guilt trial. Defendant's penalty jury heard most of Miller's testimony. Defendant raises several issues regarding that testimony.

#### 1. Claim of Ineffective Assistance of Counsel for Not Objecting to the Testimony

Defendant contends his penalty jury should not have heard Miller's testimony. He did not object at trial to that testimony, so he has forfeited the issue on appeal. (*People v. Riel* (2000) 22 Cal.4th 1153, 1178-1179.) Recognizing this circumstance, defendant contends his attorneys were ineffective for not objecting. " 'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)' " (*Riel*, at p. 1175.) " 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' " (*Id.* at p. 1185.)

Defendant contends there could have been no tactical reason for counsel not to object to his jury hearing Miller's testimony. We disagree. Counsel might have

38

believed it advantageous for his jury to be reminded that defendant did not act alone. Moreover, counsel might have believed that if Miller tried to blame defendant for Miller's criminal behavior, he would lose credibility given his prior inconsistent statements. Counsel might also have believed that Miller's deflecting the blame might compare unfavorably with defendant's acceptance of responsibility, as reflected in his guilty plea. On this record, we cannot say that counsel acted incompetently in not objecting.

Moreover, an objection would have lacked merit. Miller was the only living person, other than defendant, who was present in the liquor store during the robbery. His testimony was highly relevant to the circumstances of the crime, a sentencing factor for the jury to consider. (Pen. Code, § 190.3, factor (a).) Defendant had the opportunity to confront and cross-examine Miller. (Defendant's attorneys did not actually cross-examine Miller, possibly believing that the prosecutor's extensive cross-examination, which undercut Miller's credibility, was sufficient. But that does not matter; what matters is the *opportunity* to cross-examine. (*People v. Rodriguez*, *supra*, 58 Cal.4th at p. 634.)) No rule prevents one defendant from presenting testimony damaging to another defendant. (*People v. Keenan* (1988) 46 Cal.3d 478, 500 & fn. 5.) "An essential goal of a trial is that the fact finder determine what happened through a fundamentally fair and reliable process." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 381 [regarding denial of severance].) Allowing defendant's jury to hear testimony from the other participant in the crime, subject to cross-examination, was entirely fair. Indeed, the jury's ability to compare the relative culpability of the two participants made the judgment more, not less, reliable. (*Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633, 645-646]; *People v. Sánchez* (2016) 63 Cal.4th 411, 465-466.)

Defendant contends that allowing his jury to hear Miller's testimony transformed Miller into the prosecutor, and that private prosecutions are not permitted. However, although Miller, like any other witness, presented relevant and admissible evidence, he was not prosecuting defendant. He was defending against criminal charges. At all times, the San Diego County District Attorney's office was the prosecutor. That office unquestionably had the authority to prosecute both defendant and Miller. Accordingly, we see no basis on which to exclude Miller's testimony had defendant objected. "Because there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616.)

Defendant makes much of certain evidence presented against Miller that Miller's jury, but not his, heard. The prosecution presented evidence of Miller's confession to the police during its case-in-chief against Miller, but defendant's jury was not permitted to hear that evidence. The reason was that, until Miller testified and defendant had the opportunity to confront him, Miller's statements were not admissible against defendant. (See generally *Crawford v. Washington* (2004) 541 U.S. 36.) Defendant asserts that, as he states it, "Miller later admitted that it was his idea to rob the store." He contrasts that asserted admission with Miller's trial testimony blaming defendant for the crime, and implicitly faults his attorneys for not eliciting this evidence on his own behalf.

Defendant's assertion is not quite accurate. Miller said that when he and defendant were talking about locations to rob, Miller suggested the liquor store because of his knowledge of it. Miller did not say that it was his idea to commit a robbery, only that he suggested the liquor store as the target. Miller also told the investigator that defendant was calling the shots, and that, after the liquor store

40

robbery, defendant asked Miller to participate in another robbery, but Miller declined.

It was probably wise for defendant's attorneys not to go into Miller's statements. Suggesting a particular target after the decision to commit a robbery has been made is different from having the idea to commit the robbery in the first place. As a whole, Miller's statements to the police indicated that defendant, not Miller, was the leader. The rest of the evidence did so also. Several years before the liquor store robbery, defendant committed two armed robberies or carjackings. After a period of incarceration for these crimes, he committed three additional armed robberies or attempted robberies, with a different cohort each time. Given these facts, it would be difficult for counsel to credibly portray defendant as a mere follower, not a leader. Any such attempt might have only served to undercut the extensive case in mitigation the defense did present — that his horrific childhood, and the lack of professional intervention when needed, led to his criminal career.

In sum, defendant fails to demonstrate that his attorneys were ineffective in failing to object to Miller's testimony.

### 2. Failure to Provide Discovery of a "Free Talk"

After Miller's arrest, he gave certain statements to the police. Defendant received discovery of those statements. Later, Miller gave what the parties called a "free talk." As used here, it appears that a "free talk" is a statement about the crime that a criminal defendant provides to the prosecutor or investigators (or both), in defense counsel's presence, with the aim of possibly leading to a plea bargain and the defendant's testifying against a codefendant. The free talk was generally consistent with Miller's later trial testimony, except that in the free talk he also stated that he heard defendant say, "I gotta smoke 'em," because they had

41

seen his face; that he tried to talk defendant out of it; and that he heard Heather Mattia begging for her life.

Normally, the prosecution must disclose to the defendant statements of other defendants. (Pen. Code, § 1054.1.) However, the prosecutor moved the court, pursuant to Penal Code section 1054.7, for permission not to provide discovery of the free talk, which it described as information provided by "John Doe # 1."[3] The prosecutor represented that none of the information was exculpatory but was, instead, incriminatory. Defendant opposed the motion.

After a hearing in defendant's absence, the court granted the motion, finding "good cause to defer disclosure of the name, address and statement of John Doe No. 1" (i.e., Miller). The court "weighed the following: a) the possibility of danger to John Doe No. 1 if his identity is disclosed immediately; b) the nature of the statements attributed to John Doe No. 1; c) the inculpatory information provided by John Doe No. 1 would not serve the interests of Defendant Rices on the issue of penalty; d) the information contained in the statements is available in other materials already disclosed to the defense; e) the representation of the People that John Doe No. 1 will not be called as a witness by the People; and f) the absence of detriment to defendant's right of confrontation if disclosure is delayed."

The People did not call Miller as a witness. He did, however, testify on his own behalf, partly in front of defendant's penalty jury. It is not clear from the record to what extent, if at all, defendant's attorneys were aware of the existence

---

[3]      Penal Code section 1054.7 provides that disclosure may be "denied, restricted, or deferred" if "good cause is shown." " 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." (*Ibid*.)

42

of the free talk.  In a discussion during part of the case against Miller, held before Miller testified but in the absence of defendant's attorneys, the prosecutor stated that it had "communicated" to defense counsel Chambers one inconsistent statement Miller made in the free talk.  He told counsel that Miller said a different person was the getaway driver, rather than someone called "Nut-Nut," who Miller had originally identified as the driver.  The prosecutor said he did so "because I have a *Brady* obligation.  [*Brady v. Maryland* (1963) 373 U.S. 83.]  And I said [to defendant's counsel], you need to know that he identified someone different as the driver.  I did not give them any more details."  Miller's attorney stated at the same hearing, "I think Mr. Chambers knows that there's been a free talk."  Because the record is unclear, we will assume that defendant's attorneys were unaware that the free talk had occurred.  The prosecution did not provide discovery of the free talk until after trial.

Defendant contends that either the court or the prosecutor should have provided discovery of the free talk before Miller testified, and the failure to do so violated his constitutional rights to due process and the effective assistance of counsel.  As the prosecutor represented to the court in its motion not to provide the discovery, nothing in the free talk was favorable to defendant.  Accordingly, there was no error under *Brady v. Maryland*, *supra*, 373 U.S. 83 (concerning the prosecutor's duty to disclose exculpatory evidence).  However, we will assume that once Miller chose to testify, it should have been apparent to both the court and prosecutor that the free talk had to be disclosed to defendant, and that the failure to disclose it violated his constitutional rights.

"To the extent the denial of discovery implicated defendant's federal due process rights [citation], the applicable test is whether the error is harmless beyond a reasonable doubt."  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)  The free talk contained nothing favorable to defendant.  It was generally consistent with

43

Miller's later trial testimony except that it contained statements even more damaging to defendant than anything in that testimony. The prosecution made no use of the free talk. Even if he had known of it, defendant could not have used it either to impeach Miller's trial testimony or as prior inconsistent statements. Defendant did know Miller's *earlier* statements to the police, which were quite different from his trial testimony and the free talk. Defendant could have challenged Miller's credibility with those earlier statements. He did not do so himself, presumably because the prosecution had already done it effectively.

Defendant argues that had his attorneys known of the free talk, and thus of the likelihood that Miller would try to shift blame to defendant, they would surely have objected to his jury's hearing Miller's testimony. On this record, we do not know. Counsel might still have believed that any attempt by Miller to shift blame to defendant would be discredited by his earlier statements, as, indeed, it was, although by the prosecutor. And, given defendant's acceptance of responsibility for his crimes, counsel might reasonably have believed that discrediting Miller would benefit defendant. But even if we assume counsel would have objected to defendant's jury hearing Miller's testimony had they known of the free talk, as we have explained, no valid basis for such an objection existed.

Miller's testimony (as distinguished from his prior statements to police) was not particularly important. He did try to blame defendant for the robbery, but the prosecution effectively challenged his credibility with his prior statements and a friendly letter he wrote to defendant after his arrest. (See pt. II. H., *post*.) His testimony received little comment in the parties' jury arguments. The prosecutor, like defense counsel, described it as "incredible." He argued that Miller's prior statements were more reliable than his trial testimony. The prosecutor relied on no portion of Miller's testimony in his arguments to the jury. The only significant item of evidence to come out of Miller's testimony was his prior statement —

44

which he repudiated at trial — that defendant shot the victims while they were begging for their lives.  Because defendant had the opportunity to confront Miller, that statement was admissible both as impeachment and for its truth.  (Evid. Code, § 1235; see *People v. Rodriguez*, *supra*, 58 Cal.4th at p. 633.)  The prosecutor did emphasize that statement in his jury argument.  He argued, "If there wasn't one shred of aggravating evidence beyond that, not one thing, you would be justified in saying, 'For that conduct, Jean Pierre Rices, you deserve to die.' "  Defendant's knowledge of the free talk could have had no effect on the credibility or impact of that prior statement.

For these reasons, disclosing the free talk before Miller testified would not have significantly affected the trial.  Any constitutional violation was harmless beyond a reasonable doubt.

### 3.  Asserted Instructional Error

The court instructed the jury that, because Miller was an accomplice in the crimes, it should view "with caution" any of his statements or testimony that tended to incriminate defendant.  Defendant contends the court should additionally have instructed the jury that Miller's testimony or statements required corroboration before the jury could consider them.  (Pen. Code, § 1111.)  It did not have to so instruct.  Defendant had already been convicted of the crimes to which Miller testified.  His testimony merely went to the circumstances of the crime, a sentencing factor for the jury to consider (Pen. Code, § 190.3, factor (a)), not to whether defendant was guilty.  A corroboration instruction at the penalty phase is appropriate when the accomplice testifies about unadjudicated crimes under Penal Code section 190.3, factor (b).  (*People v. Hernandez* (2003) 30 Cal.4th 835, 873-874.)  But it is not needed when the accomplice testifies about crimes of which the defendant has already been convicted.  (*People v. Moore* (2011) 51 Cal.4th 1104,

45

1143-1144; *People v. Williams* (1997) 16 Cal.4th 153, 275-276; *People v. Easley* (1988) 46 Cal.3d 712, 733-734.)

Defendant argues that Miller did not merely testify that defendant committed the crimes but provided details beyond their minimum elements. That does not matter. The accomplice corroboration requirement only applies when the prosecution is proving a previously unadjudicated crime, not when the witness merely testifies about details of a crime that has already been adjudicated. This is because when corroboration is required, such corroboration "may be slight and entitled to little consideration when standing alone. However, it must tend to implicate the defendant by relating to an act that is an element of the crime. It need not by itself establish every element, but must, without aid from the accomplice's testimony, tend to connect the defendant with the offense." (*People v. Nelson* (2011) 51 Cal.4th 198, 218.) When the defendant has been *convicted* of the crime, this standard will always have been satisfied. Hence, no accomplice corroboration is needed. (*People v. Easley*, *supra*, 46 Cal.3d at p. 734.) For these reasons, there was also no federal constitutional violation. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 473.)

The conclusion that no corroboration instruction was warranted also disposes of defendant's additional argument that his attorneys were ineffective in failing to request one.

### E.  Defendant's Criminal Conduct While a Juvenile

The prosecution presented evidence in aggravation of two crimes of violence defendant committed in 1999, when he was 17 years old, and of his conviction for one of those crimes. Defendant contends reliance on such evidence violated his rights under the Eighth Amendment to the United States Constitution. It did not.

46

"We have long held that evidence of violent juvenile misconduct that would have been a crime if committed by an adult is admissible under [Penal Code] section 190.3, factor (b). [Citations.] We also have repeatedly held that the admission of such evidence passes constitutional muster. [Citations.] Nevertheless, defendant argues admission of the evidence was unconstitutional in light of the high court's decision in *Roper v. Simmons* (2005) 543 U.S. 551, holding that the Eighth and Fourteenth Amendments prohibit execution of individuals who were under 18 years of age at the time of their capital crimes. Defendant's reliance on *Roper* is misplaced. We recently have rejected defendant's argument by explaining that *Roper* 'says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile.' (*People v. Bramit* (2009) 46 Cal.4th 1221, 1239; accord, *People v. Taylor* (2010) 48 Cal.4th 574, 653-654." (*People v. Lee* (2011) 51 Cal.4th 620, 649.)

Defendant cites two additional recent high court decisions concerning when a person may receive a sentence of life in prison without parole for crimes committed while a juvenile. (*Miller v. Alabama* (2012) 567 U.S. 460; *Graham v. Florida* (2010) 560 U.S. 48.) The same reasoning applies to those cases. They do not address the question of whether evidence of juvenile misconduct can be considered on the question of what punishment a defendant may receive for crimes committed as an adult. Defendant also argues that the high court's yet more recent decision in *Hall v. Florida* (2014) __ U.S. __ [134 S.Ct. 1986] affects this issue. It does not. That case, involving a Florida restriction on evidence admissible to show that a person has an intellectual disability, is even further afield from this question than the other cases defendant cites. The high court has never suggested that evidence of juvenile misconduct may not be admitted in deciding the proper punishment for crimes an adult commits.

47

Defendant did not receive the death penalty for his juvenile crimes. He received the death penalty for the execution-style murders of two unresisting robbery victims committed when he was an adult. No legal principle prohibits admitting evidence of his violent juvenile conduct on the question of what the punishment for those crimes should be.

### F. Excluding Evidence of the Impact of Defendant's Execution on His Family

Defendant's aunt testified on his behalf in mitigation. She testified that she loved him. Defendant then asked her, "What do you think the penalty for the crimes that he's committed should be?" The court sustained the prosecutor's objection to the question "as formed." Defendant then asked, "Do you think he should get the death penalty?" When the prosecution again objected, the court and parties held a conference outside the jury's presence. The court explained its ruling: "As to the objection, I believe we may be in a generally relevant area. [The witness] has indicated she loves Mr. Rices, and I will allow you to inquire as to her thoughts about what impact certain penalties might have on her due to that degree of love. But just offering opinion as to what penalty, I'm going to sustain that objection. It has to be linked, somehow, to a circumstantial tidbit of evidence regarding Mr. Rices and his character before I would allow that type of question."

Later, defendant called his grandmother as another witness in mitigation. He asked her, "Do you have an opinion about what the impact would be on Jean Pierre's family if he was to be executed?" The court sustained the prosecutor's objection, then held a conference outside the jury's hearing. The court explained that "the impact of execution on the defendant's family is not relevant, necessarily, to a mitigating factor in the case. If somehow it might indirectly bear on his character, that's one thing, but this question doesn't get to that. . . . His character, obviously, he's got positive characteristics, go for it. But right now, you're just

saying what impact would this have on the family. That's not relevant to a character trait of Mr. Rices." In front of the jury, defendant elicited the witness's testimony that defendant had a positive relationship with his son, whom he loved, and that "the main thing is for him to be with one of his parents."

When the parties and court were discussing jury instructions, the prosecutor objected to the following language that defendant had requested from CALCRIM No. 763: "[Y]ou may consider evidence about the impact the defendant's execution would have on [his] family if that evidence demonstrates some positive quality of the defendant's background or character." He argued there was no evidence to support the instruction. The court stated that it tended to agree, but withheld a final ruling until it reviewed the case of *People v. Ochoa* (1998) 19 Cal.4th 353 (*Ochoa*). Later, after it reviewed that case and the transcript of the relevant testimony, the court sustained the prosecutor's objection to that sentence of the instruction.

Ultimately, the court instructed the jury: "Although you may consider sympathy or compassion for the defendant, you may not let sympathy for the defendant's family influence your decision." (CALCRIM No. 763.)

Defendant contends the court erred in not permitting the questions regarding the impact defendant's execution would have on his family. It did not. In *Ochoa*, *supra*, 19 Cal.4th 353, the case the trial court consulted, we explained that "what is ultimately relevant is a defendant's background and character — not the distress of his or her family. A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character. The jury must decide whether the defendant deserves to die, not whether the defendant's family deserves to suffer the pain of having a family member executed." (*Id*. at p. 456.) "In summary, we hold that sympathy

49

for a defendant's family is not a matter that a capital jury can consider in mitigation, but that family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character." (*Ibid*.) We have repeatedly reiterated these principles. (E.g., *People v. Williams* (2013) 56 Cal.4th 165, 197-198, & cases cited.) "Nothing contrary to these principles occurred at trial." (*Ochoa*, at p. 456.)

Defendant contends that *Ochoa*, *supra*, 19 Cal.4th 353, was wrongly decided. We have rejected substantially similar arguments and continue to do so. (*People v. Bennett* (2009) 45 Cal.4th 577, 602.)

### G. Prosecution's Argument Regarding Future Dangerousness

Over objection, the court permitted the prosecutor to argue to the jury that the evidence of defendant's violent criminal conduct while incarcerated showed that he would be dangerous in a prison setting in the future. Defendant contends the argument was improper because future dangerousness is not one of the statutory factors in aggravation listed in Penal Code section 190.3.

"The circumstances of a defendant's crimes, his unadjudicated violent conduct, and his violent conduct underlying a prior conviction, are aggravating factors under [Penal Code] section 190.3, factors (a), (b), and (c). [Citation.] A prediction that a defendant will be dangerous in the future based on evidence admitted under factors (a)–(c) is not itself a fact or an aggravating factor. It is an inference drawn from the aggravating evidence, and is properly argued by a prosecutor and considered by the jury in making its penalty determination. [Citation.] As the high court has recognized, ' "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." ' (*California v. Ramos* (1983) 463 U.S. 992, 1002.) And as the Attorney General observes, our cases

stand 'for the unsurprising proposition that the prosecution may make reasonable inferences from properly admitted evidence to argue for imposition of the death penalty.' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 53.) There was no error.

## H.  Trial Court's Ex Parte Communication with the Jury

As discussed previously, codefendant Miller testified on his own behalf, partly in front of defendant's penalty jury.  In essence, Miller claimed defendant forced him to participate in the robbery.  The prosecutor cross-examined him at length and impeached his credibility with his prior inconsistent statements.  The prosecutor also showed Miller a blowup of a letter Miller had written to defendant.  The blowup was marked in front of defendant's jury as People's Exhibits 65 and 65A.  In his testimony, Miller acknowledged that he had written the letter to defendant, and that it contained the following language:  " 'I love you, boy, and the struggle only gets better.  Until pencil meets paper again, your protégé, with love, lil bro, Ant."  ("Ant." is apparently short for Anthony, Miller's first name.)  The prosecutor concluded his cross-examination of Miller in front of defendant's jury by asking, "That letter was sent since you've been in custody facing charges on this case, correct?"  Miller said yes.  The prosecutor then said, "Thank you, sir. I have no further questions."

Although People's Exhibits 65 and 65A were marked and shown to Miller in front of defendant's jury, and placed into evidence in Miller's guilt trial, it does not appear the exhibits were formally received in evidence in defendant's penalty trial.  The clerk's transcript indicates that, during deliberations, the jury "made an oral request" to see exhibits 65 and 65A, "which were not received into evidence on the Rices case but were presented to both juries during the overlapping evidence with the Miller case.  The Court directs the bailiff to inform the jurors of

51

this fact." The jury continued its deliberations and reached a verdict later the same day.

During the record settlement process, the court settled the record regarding what occurred: "The Clerk's Minutes of June 24, 2009, show that the jury made an oral request to see Exhibit 65 and 65a which had been shown to them in open court. The communication was not recorded by the court reporter. Defendant has asked for record settlement on this matter. The court has reviewed its notes and the Clerk's Transcript. The record is settled on this matter as follows: At 1:57 p.m. that day, (1) the jury made an oral communication to the bailiff for People's Exhibits 65 and 65a, (2) the bailiff relayed the jury's request to the court, (3) the court advised the bailiff to tell the jury that these exhibits were not admitted into evidence in Mr. Rices's trial, and (4) the bailiff relayed this information to the jury. Neither counsel for the People nor counsel for defendant were notified of the jury's note or the court's communication."

Defendant contends, and the Attorney General concedes, that the court's ex parte communication with the jury violated his federal constitutional "right to personal presence at all critical stages of the trial and the right to counsel . . . ." (*Rushen v. Spain* (1983) 464 U.S. 114, 117.) We agree the court committed federal constitutional error. " 'This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case.' " (*People v. Wright* (1990) 52 Cal.3d 367, 402.) However, the error was "harmless beyond a reasonable doubt." (*Rushen v. Spain*, at p. 121.) "Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial, and thus constitute federal constitutional error, reversal is not required where the error can

52

be demonstrated harmless beyond a reasonable doubt." (*Wright*, at p. 403; accord, *People v. Clark* (2011) 52 Cal.4th 856, 987.)

Noting that his right to the effective assistance of counsel is implicated, and citing *United States v. Cronic* (1984) 466 U.S. 648, defendant argues that the error is reversible per se even without a showing of prejudice. We disagree. "*Cronic* recognized a narrow exception to" the rule that a defendant claiming ineffective assistance of counsel must show prejudice. (*Florida v. Nixon* (2004) 543 U.S. 175, 190.) The high court has made clear that exception is very narrow. It cited *Bell v. Cone* (2002) 535 U.S. 685, 696-697, as holding that "for *Cronic*'s presumed prejudice standard to apply, counsel's 'failure must be complete.' " (*Florida v. Nixon*, at p. 190.) This exception does not apply here. As we explain, the error had little effect on counsel's performance or the trial. There was no complete failure of counsel. The error is subject to normal federal harmless error analysis, as established in *Rushen v. Spain*, *supra*, 464 U.S. 114.

Defendant argues that if counsel had been informed of the jury's request, he might have argued successfully that the exhibits either had been or should be received into evidence. We agree and will assume that, had the court consulted counsel, it would have provided the exhibits to the jury. But that is the extent of the error's effect. It prevented the jury from viewing the physical exhibits, but it did not negate Miller's oral testimony. That testimony is what impeached his credibility.

In front of defendant's jury, Miller acknowledged that he wrote the letter to defendant after his arrest in this case, and that the letter contained the language read into the record. This testimony impeached Miller's testimony blaming defendant. The physical exhibits contain nothing significant not included in the oral testimony that might have further impeached Miller or otherwise helped defendant.

As discussed previously, both parties, including the prosecutor, argued to the jury that Miller's trial testimony was not credible. The prosecutor relied on *none* of that testimony in arguing the case to the jury. Rather, he cited in aggravation only Miller's prior statement regarding the victims' pleading for their lives. If anything, the letter— which suggested Miller would not have lied to defendant's detriment — *bolstered* the credibility of that statement. For these reasons, the ex parte communication — which, we will assume, erroneously prevented the jury from viewing the physical letter — was harmless beyond a reasonable doubt. For the same reasons, the error did not violate defendant's right under the Eighth Amendment to the United States Constitution to a reliable penalty determination.

## I. Denial of New Trial Motion

Defendant moved for a new trial on several grounds, two of which were that the court erred in denying mistrial motions he made during the trial. Both mistrial motions were based on a witness's saying something that was inadmissible against defendant. The court denied the motion for a new trial. Defendant contends the court erred.

The standard of review of a ruling denying a mistrial motion and a ruling denying a new trial motion is the same: abuse of discretion. (*People v. Harris* (2013) 57 Cal.4th 804, 848 [mistrial motion]; *People v. Coffman and Marlowe* (2004) 34 Cal.4th 1, 127 [new trial motion].) As we explain, the court acted within its discretion when it denied the mistrial motion on both occasions and, accordingly, it acted within its discretion when it later denied a new trial on the same grounds.

### 1. Reference to Gang Membership

The court and parties anticipated — correctly, as it turned out — that the prosecution would not present any evidence that defendant belonged to a gang. When Miller testified in front of defendant's jury, he referred to defendant's "reputation" of "being a gang member." Defendant objected. The court allowed Miller's jury to consider the testimony, but it admonished defendant's jury "to disregard that reference to 'gang' and you are to treat it as though you never heard it." Defendant moved for a mistrial based on this reference, which the court denied. Later, based on defendant's objections on other grounds, the court dismissed defendant's jury for the remainder of Miller's testimony to prevent prejudicial evidence coming in against him.

A court should grant a mistrial motion based on a witness's statement if it judges the defendant has been prejudiced in a way that an admonition or instruction cannot cure. Because this is inherently a speculative matter, the trial court has considerable discretion in ruling on a mistrial motion. (*People v. Harris*, *supra*, 57 Cal.4th at p. 848.) Here, the court acted well within its discretion. No prosecution evidence connected defendant with a gang. In light of the prompt admonition, the fleeting and vague reference, by a witness with an obvious motive to besmirch defendant, could not have prejudiced defendant. Miller's statement was not "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)

The lack of prejudice was even clearer when the court ruled on the new trial motion. As the prosecution pointed out in opposing the motion, defendant himself interjected his gang membership into the case. Dr. Rahn Minagawa, his expert witness, testified that his gang membership was a bad influence contributing to his criminal behavior. (See *People v. Dement* (2011) 53 Cal.4th 1, 40 [witness's improper statement "was largely duplicative of evidence the jury properly

received"].)  Thus, the court acted within its discretion in denying the new trial motion.

### 2. *Reference to Defendant's Bragging*

During pretrial hearings, the court excluded evidence regarding defendant's overt remorselessness.  James Hoefer, the investigator in this case, testified at length about the investigation.  At one point, he stated, "We eventually received information from witnesses who stated that Mr. Rices bragged about —."  The prosecutor cut him off, and defendant moved to strike the statement.  The court admonished the jury, "There's certain things that I've excluded in terms of his description of what other people have said because it's technically hearsay."  It said it was "striking the word that you [the prosecutor] cut him off on, 'bragged.' It is to be disregarded."  The questioning continued with no further reference to bragging.

Later, defendant moved for a mistrial due to the witness's reference to bragging.  The court denied the motion:  "Based upon my belief that it was unintentional, based upon my belief that this jury will abide by my instruction, which I'm going to give at the time of the legal instructions that they are to disregard, fully, any evidence that they have been directed to disregard, I do not believe that this inadvertent comment justifies a mistrial."  As part of the instructions at the end of the evidence portion of trial, the court instructed the jury, "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

We see no abuse of discretion in denying either the mistrial motion or new trial motion on this basis.  This reference, cut off immediately, did not even indicate what defendant was supposedly bragging about.  Moreover, the court promptly admonished the jury to disregard it.

**J. Denial of the Automatic Motion to Modify the Verdict**

The court denied defendant's automatic motion to modify the verdict. In ruling on the motion, the court may consider only the evidence presented to the jury. (*People v. Rodriguez*, *supra*, 58 Cal.4th at p. 651.) Defendant contends that he is entitled to a new hearing on the motion because the trial court had reviewed the contents of Miller's free talk before trial. He stresses that he was not aware of the free talk at the time of the hearing and thus had no opportunity to discuss its contents. (See pt. II.D.2., *ante*.) There was no error.

At the outset of its ruling, the trial court stated, "I have considered only the evidence presented to the jury." Its lengthy discussion of the aggravating and mitigating factors — limited to that evidence — confirms this statement. The court never referred to any statement similar to those in the free talk. Defendant notes that the court specifically stated that it had not considered information contained in the presentence report. But that statement does not somehow imply that it considered the free talk. We have no reason to doubt that, as it stated, the court considered only the evidence presented to the jury.

Defendant relies on *Gardner v. Florida* (1977) 430 U.S. 349. In that case, "When the trial judge imposed the death sentence he stated that he was relying in part on information in a presentence investigation report. Portions of the report were not disclosed to counsel for the parties." (*Id*. at p. 351.) The high court found this procedure violated due process. There is a fundamental difference between *Gardner* and this case. In *Gardner*, the court considered the information not disclosed to the defendant; here, the court did not consider that information. *Gardner* does not aid defendant. We see no error in the court's denial of the motion to modify the verdict.

**K. Challenges to California's Death Penalty Law**

Defendant reiterates numerous challenges to California's death penalty law that we have already rejected. We see no reason to reconsider our previous decisions.

Penal Code section 190.3, factor (i) (the age of the defendant) is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 977; *People v. Sanders* (1995) 11 Cal.4th 475, 563-564.) "Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." (*People v. Sánchez*, *supra*, 63 Cal.4th at p. 487.) Other than the penalty verdict itself, the jury need not achieve unanimity. (*Ibid*.) Except for other crimes evidence and prior convictions, the jury need not make findings beyond a reasonable doubt. (*Ibid*.) The court's instructions need not delete inapplicable sentencing factors. (*Id*. at p. 488.) The instructions need not delineate between aggravating and mitigating factors. (*People v. Dykes* (2009) 46 Cal.4th 731, 814.) The sentencing factors are not impermissibly vague and ill-defined. (*People v. Schmeck* (2005) 37 Cal.4th 240, 305.) "Penal Code '[s]ection 190.3's use of adjectives such as "extreme" and "substantial" in describing mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors.' " (*Sánchez*, at pp. 487-488.) "[N]o instruction on burden of proof is needed." (*Id*. at p. 487.) "California's use of the death penalty does not violate international law." (*Id*. at p. 488.)

### III.  CONCLUSION

We affirm the judgment.

CHIN, J.

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**NARES, J.\***

_____
*Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rices

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S175851
**Date Filed:** December 11, 2017

_____

**Court:** Superior
**County:** San Diego
**Judge:** Lantz Lewis

_____

**Counsel:**

Cliff Gardner, under appointment by the Supreme Court, and Rudolph J. Alejo for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Michael Murphy, Robin Urbanski and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cliff Gardner
1448 San Pablo Avenue
Berkeley, CA 94702
(510) 524-1093

Alana Cohen Butler
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9227