Filed 7/28/22  P. v. Rowland CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D079153 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BAF1800832) |
| MARCUS RAY ROWLAND, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Steven G. Counelis, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.


Marcus Ray Rowland and an accomplice committed a series of armed robberies in San Bernardino and Riverside counties on June 18, 2018.  A jury

in Riverside County found Rowland guilty of three counts of robbery (Pen. Code, § 211) and found true the allegation that Rowland was a principal in the robberies and that one or more principals was armed with a firearm (*id.*, § 12022, subd. (a)(1)).[1] Rowland admitted two prior strike convictions and received a third-strike sentence of 75 years to life plus a determinate consecutive sentence of three years. Rowland testified at trial and denied participating in the crimes. On appeal he contends that he was denied his constitutional right to effective assistance of counsel when his attorney "failed to tell him not to testify." (Capitalization omitted.) He also contends that the trial court erred when it denied his *Romero* motion and declined to exercise its discretion to dismiss his prior strike offenses.[2] We reject Rowland's contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Charges*

Rowland was charged with three counts of robbery (§ 211), each occurring on June 18, 2018. As to each count, it was alleged that Rowland was a principal in the robberies and that one or more principals was armed with a firearm (§ 12022, subd. (a)(1)). It was further alleged that Rowland suffered two prior prison terms (§ 667.5, subd. (b)), two serious prior offenses (§ 667, subd. (a)), and two strike priors (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)).

---

[1]    Unspecified statutory citations are to the Penal Code.

[2]    *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

B. *Trial*

　　1. *Prosecution's Case*

　　　　a. *First Robbery (Uncharged)*

At about 2:00 a.m. on June 17, a blue-eyed man wearing a long t-shirt, gym shorts and tennis shoes robbed a gas station in Riverside County at gunpoint. The man pointed a black handgun at the lone employee in the store and took about $200 from the cash register. Surveillance footage of the robbery was shown to the jury.

　　　　b. *Second Robbery (Uncharged)*

At about 1:00 a.m. on June 18, a man wearing a black hoodie and ski mask and blue latex gloves robbed a gas station in San Bernardino County. The man pointed a silver or chrome revolver at the employee, directed the customers in the store to " 'get down,' " and directed the sole employee to open the register. The man took the money that was in the register—about $38— and left the store. Surveillance footage of the robbery was shown to the jury. Surveillance footage from the car wash next door was also shown to the jury.[3]

　　　　c. *Third Robbery (Uncharged)*

At about 1:20 a.m. on June 18, a man wearing black clothing, a black ski mask, and black or blue gloves robbed another gas station in San Bernardino at gunpoint. The cashier testified that the man pointed a black revolver at him and directed him to open the register and then to lie on the ground. The man removed cash from the register and fled the store.

---

[3]　　The prosecutor called the owner of the car wash to the stand and played several clips of video footage. The car wash owner confirmed that the footage was from various security cameras at his car wash and confirmed that the cameras were in proper working order at the time of the robbery.

### d. *Fourth Robbery (Count 1)*

Shortly after 3:00 a.m. on June 18, a White man wearing a black ski mask and blue gloves robbed another gas station in Riverside County at gunpoint.  The man pointed a silver handgun at the lone employee, grabbed her arm, and directed her to open the register.  The man took about $100 from the register, directed the employee to lie down, and left the store.  Surveillance footage of the robbery and the parking lot outside was shown to the jury.  In the footage, a vehicle can be seen driving through the parking lot before pulling into a dirt field behind the station and turning off its lights.  The vehicle's license plate number, 8BKA559, was recorded as it passed near a particular gas pump.  The front-seat passenger exited the car wearing a cap on his head and dark clothing and walked through a planter bed toward the store entrance, with his hands in his pockets.  When the suspect exited the store, he immediately returned to the passenger side of the vehicle.  The driver turned on the lights and sped away.

R.D. pulled into the gas station parking lot shortly after the masked man walked into the store.  He was planning to buy coffee but chose not to enter the store when he saw a masked man inside.  When a suspect wearing a black ski mask and blue gloves exited the store, R.D. decided to follow him.  R.D. testified that, for a moment, the suspect disappeared behind the building, but then a vehicle making a U-turn near where the man disappeared caught his attention.  R.D. followed the vehicle and managed to write down the first three characters of the license plate—8BK—before the vehicle sped up to 90 miles per hour, and R.D. could not keep up.  R.D. described the vehicle as a compact car, dark in color.  He could not see the passengers and did not actually see the masked man enter the car.

4

e. *Fifth Robbery (Counts 2, 3)*

Shortly before 4:00 a.m. on June 18, a blue-eyed White man wearing a dark sweatshirt and a ski mask robbed another gas station in Riverside County at gun point.  The man pointed a black revolver at the two employees, directed one of them to lie on the floor and the other to open the register, took about $200, and left the store.  Surveillance footage of the robbery was shown the jury.

f. *Sixth robbery (Uncharged)*

Just after 4:00 a.m. on June 18, surveillance cameras recorded a man robbing a gas station in San Bernardino County at gunpoint.  The man was holding a black snub nose revolver and wearing black clothes, a black ski mask, and blue gloves.

g. *Investigation*

An investigator with the Riverside County Sheriff's Department testified that, after he viewed the surveillance footage of the June 17 robbery, he had no investigative leads, but he observed that the gas station was situated with close access to two freeways, making it an "easy target" for someone to rob the store and escape quickly on the freeway.  The investigator subsequently viewed the surveillance footage from the 3:00 a.m. robbery on June 18, which depicted the suspect exiting the passenger side of the vehicle.  The investigator observed that the gas station in this robbery was also situated with easy access to freeway on-ramps.  Using the vehicle's license plate number, the investigator learned that the vehicle was registered to Rowland and his mother.  The investigator contacted Rowland and requested a meeting.  The investigator subsequently searched the vehicle and found a black semiautomatic handgun under the driver's seat.  The gun was loaded

5

and resembled the firearm used in the June 17 robbery. A package of blue gloves resembling the ones worn by the robber was found in the trunk.

Officers interviewed Rowland after searching his car. The interviews were recorded and were played for the jury at trial. Rowland acknowledged that the vehicle seen in the surveillance videos was his and further acknowledged that the gun and gloves found inside were also his. Rowland told the officers that he was the only person who drove that vehicle. He said he gave his friend Dave a ride on June 18, and they stopped at a gas station so that Dave could use the bathroom. Dave came running from the bathroom saying someone was chasing him, and Rowland told him to get back in the car. Rowland insisted that he "had nothing at all to do with no robberies." Rowland also said he was "possibly" with Dave on June 17. When officers showed Rowland surveillance images from the robberies, Rowland acknowledged that the images appeared to show Dave wearing blue gloves and holding a gun, but Rowland denied knowing that Dave was going to rob anyone.

A district attorney investigator analyzed Rowland's cell phone's communications with cell phone towers between 12:55 a.m. and 4:15 a.m. on June 18, 2018. The investigator explained that a cell phone communicates with its service provider's nearest cell phone tower. His analysis showed that Rowland's cell phone communicated with cell phone towers near each robbery location at the time that location was robbed.

2. *Defense Case*

Rowland testified on his own behalf. He said that he was testifying because he "had nothing to do with these robberies" and would not "let [Dave] get [him] locked up for something [he] had nothing to do with." He admitted that he was convicted of manslaughter and attempted murder in 2002 and

6

was subsequently convicted of unlawful possession of a firearm. He said that he knew Dave because they were from the same neighborhood in Pomona. Rowland stated that, in June of 2018, he was involved with two different women, one of whom lived in Hemet. When he was at his girlfriend's house in Hemet, he would leave his phone in his car because his other girlfriend would call repeatedly, and he did not want the two women to find out about each other. Occasionally when Rowland visited the girlfriend in Hemet, his friend Dave would accompany him, and they would "drink and smoke weed." On some of those occasions, Rowland's girlfriend's cousin Derrick would be there too. According to Rowland, Derrick "kind of look[ed] like [Rowland], but [was] skinnier than [Rowland]." Rowland believed that the June 18 robberies were committed by Dave after Rowland, Dave and Rowland's girlfriend smoked and drank at the girlfriend's house in Hemet, and Dave took the car (with Rowland's cell phone in it) without permission after Rowland had fallen asleep. Rowland testified that, when police officers were questioning him about the robberies, they showed him several still images captured from surveillance video footage. He said that he was "confused" during the questioning; he "thought it was like different locations" and "different dates." He stated that he did take Dave to a gas station to use the restroom on one occasion but was not sure when.

On cross-examination, the prosecutor showed Rowland security camera footage from the car wash in San Bernardino County, taken at the time the gas station next door was being robbed. In the footage, someone who looks like Rowland pokes his head out of the door on the driver's side of Rowland's vehicle. Rowland testified that this person "looks like Derrick," his girlfriend's cousin. Rowland stated that he did not know Derrick well, but he knew that Derrick lived in Hemet, and said that Derrick and Dave were

7

closer friends than Derrick and Rowland. Rowland vehemently denied having anything to do with the robberies.

### 3. *Closing Arguments*

The prosecutor argued that Rowland and his friend Dave committed a series of burglaries during a round-trip drive between Pomona and Hemet the morning of June 18. The prosecutor argued that the men committed the first two robberies on their way to Hemet and robbed three more gas stations on their way home. The prosecutor suggested that, during the two-hour break between the two series of robberies, the perpetrators visited Rowland's girlfriend in Hemet. The prosecutor showed the portion of surveillance footage from the car wash next to the gas station in which the vehicle's driver can be seen opening the car door.

Rowland's defense attorney argued that the prosecution had not met its burden to establish Rowland's guilt beyond a reasonable doubt. He argued that Dave took Rowland's keys while Rowland slept and used Rowland's vehicle, with Rowland's cell phone in it, to commit the series of robberies. Defense counsel contended that it was Derrick, not Rowland, who is seen in the surveillance footage showing the driver, and if it really were Rowland, that image would have been the prosecution's "Exhibit A."

In rebuttal arguments, the prosecutor argued that Rowland's theory of the case was improbable and required the jury to find that, while Rowland slept, Dave took Rowland's car and cell phone to pick up Rowland's "look-alike," Derrick. Together Dave and Derrick drove from Hemet back to San Bernardino to commit the first robbery in a series that began in San Bernardino, proceeded toward Hemet, and then moved back up toward Pomona. After committing the robberies, Dave returned the car to Rowland's girlfriend's house in Hemet, without Rowland's knowledge.

8

#### 4. *Conviction and Sentencing*

The jury found Rowland guilty of three counts of robbery and found true the allegation that for each offense, Rowland was a principal in the offense and another principal in the offense was armed with a firearm. (§§ 211, 12022, subd. (a)(1).)

In a bifurcated proceeding, Rowland admitted having committed the prior offenses, which involved convictions for attempted murder and manslaughter in 2002 (§§ 187, 664, 192) and possession of an illegal weapon in 2012 (§ 12021, subd. (a)(1)). The trial court denied Rowland's new trial motion and his *Romero* motion, both of which are discussed in detail, *post*. The trial court sentenced Rowland to three consecutive sentences of 25 years to life for each robbery count, plus one year for each of the three gun enhancements, for a total prison term of 75 years to life, plus a determinate consecutive sentence of three years.[4]

## DISCUSSION

### I.

### *Ineffective Assistance of Counsel*

Rowland contends that he was denied his constitutional right to the effective assistance of counsel "when defense counsel failed to tell him not to testify." (Capitalization omitted.) We conclude that on this record, Rowland has not established that counsel's performance was deficient.

---

[4] The trial court struck the section 667.5, subdivision (b) "nickel" priors pursuant to changes in the law and exercised its discretion to strike the two section 667, subdivision (a) serious prior offenses. (§§ 667.5, subd. (b), 667, subd. (a), 1385.) The trial court also awarded sentencing credit and ordered Rowland to pay various fines and fees.

A.  *Additional Background*

After the prosecution's case-in-chief, the court advised Rowland on the record (outside the presence of the jury) that he had both "the absolute right to testify in this case" and "the absolute right not to testify."  Rowland confirmed that he understood both of those rights, indicated that no one was forcing him to exercise one right over the other, and stated, "I exercise my right to testify."

Rowland proceeded to testify, as described *ante*, that he did not participate in the robberies and believed that Dave took his car—which had Rowland's cell phone in it—while Rowland was asleep.  On cross-examination, the prosecutor played for the first time a portion of the surveillance footage from the car wash next to the gas station in which a man can be seen in the driver's side of Rowland's vehicle.  Rowland testified that this person "looks like Derrick," Rowland's girlfriend's cousin.  Rowland testified that he did not know Derrick well, but he knew that Derrick lived in Hemet, and Derrick and Dave were friends.

After the jury rendered its verdict, Rowland requested that the trial court appoint substitute counsel to file a motion for new trial based on a claim of ineffective assistance of counsel.[5]  In the new trial motion, Rowland argued that trial counsel had made "several errors that hindered [his] right to a fair trial," including advising him to testify "in error."  (Underscoring omitted.)  Rowland argued that a reasonably competent attorney acting as a diligent advocate would not have advised him to take the stand, because testifying "caused his damning priors to be revealed" and his testimony

---

[5]    Rowland also moved to relieve counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.  The trial court denied Rowland's *Marsden* motion before appointing substitute counsel.

offered nothing to bolster his defense. Rowland further argued that, if he had not testified, the prosecutor "would not [have been] able to play the specific video that the People were claiming had Mr. Rowland in it."[6] Rowland did not include a declaration or affidavit in support of his claims.

A hearing on the motion was held more than a year and a half after trial. Rowland waived his attorney-client privilege, and Rowland's trial counsel testified regarding his representation of Rowland at trial. Counsel recalled that the central issue was whether it was Rowland who drove the getaway car during a series of robberies. Counsel testified that he always had a discussion with a client who was going to testify to "give them advice, dos and don'ts, what are the pros and cons of testifying." He also prepared a client to testify and would "go through the type of questions that [he was] going to ask[ ] and get them to practice answering them." He would typically discuss potential questions to expect on cross-examination and "how to answer them properly." Counsel did not specifically remember telling Rowland that he should not testify; counsel stated that "typically, [he] wouldn't do that. Typically, this is a discussion [counsel would have] with a client about the client making the decision about whether to testify. [Counsel] might make a recommendation, but [he] would never, usually, just say, [']Hey, don't testify, that's my advice to you.['] [He] wouldn't say that." Counsel recalled discussing with Rowland that the prosecutor had not played the video footage showing the vehicle's driver during the case-in-chief. Although counsel did not recall the specifics of that conversation, counsel recalled that he told Rowland that if he did not testify, the prosecution would not be able to show the previously unseen video. Counsel also recalled

---

6    Rowland asserted other claims of error in his motion, but because they are not asserted on appeal, we do not address them.

11

discussing the possibility of Rowland testifying but did not recall whether he had advised Rowland to "maybe, not testify." He recalled advising Rowland of his right not to testify. Counsel stated, "I don't know that [Rowland], specifically, expressed a desire to testify, but I do recall that there was no struggle over the issue about whether or not he's going to testify. In other words . . . it took no arm twisting from me."

Rowland did not testify at the hearing on his motion for a new trial.

The trial court denied the motion. The court referenced the portion of the surveillance video depicting the driver of the vehicle registered to Rowland and remarked that, "The jury came to the factual conclusion that the person who was in the video was the person in the courtroom." The court continued, "[A]s I looked at the video, I felt and I considered that to be a photograph of [Rowland]. I never expressed those views to the jury. I've never expressed those views in any way at the time of trial. This is the first time I'm expressing those views, only because we are talking about what the case is about, the evidence that was presented, and the claims that you're making." The court concluded, "there was no ineffective assistance of counsel committed . . . in this case" and found that Rowland "was given assistance of counsel, which meets the [legal] standards."

B. *Applicable Legal Standards*

A trial court shall grant a motion for new trial where the trial court finds that the defendant received ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) " 'The law governing [an ineffective assistance of counsel] claim is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to

12

effective assistance.' " [Citations.]  It is defendant's burden to demonstrate the inadequacy of trial counsel.' " (*People v. Vines* (2011) 51 Cal.4th 830, 875-876, italics omitted, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

" ' "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80 (*Rices*); *Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).)  "Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant 'must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)  If the defendant makes an insufficient showing on either component, the court need not address the other one. (*Strickland*, at p. 697.)

When, as in this case, a trial court has denied a motion for new trial based on a claim of ineffective assistance of counsel, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent that they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts established demonstrate a violation of the right to effective counsel.  (See *People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725 (*Taylor*).)

C.  *Analysis*

Initially, in his new trial motion, Rowland contended that counsel's performance was constitutionally deficient because counsel had advised

Rowland to testify "in error." (Underscoring omitted.) At the hearing on the motion, trial counsel testified that he did not recall whether he recommended that Rowland testify or not testify and did not recall whether Rowland expressed a desire to testify. Counsel indicated that he typically advised a defendant regarding "the pros and cons of testifying" but generally would not tell a defendant not to testify. Rather, he would have a discussion with the defendant "about the [defendant] making the decision . . . whether to testify." Presumably because of counsel's testimony at the hearing, Rowland now contends that counsel's performance was deficient because counsel failed to advise him *not* to testify.

As the Attorney General correctly points out, trial counsel cannot direct a defendant not to testify. " 'Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.' [Citation.] The defendant's 'absolute right not to be called as a witness and not to testify' arises from the Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution. [Citation.] Although tactical decisions at trial are generally counsel's responsibility, the decision whether to testify, a question of fundamental importance, is made by the defendant after consultation with counsel." (*People v. Hines* (1997) 15 Cal.4th 997, 1032.) Counsel's testimony indicates that he advised Rowland of his right not to testify, discussed the advantages and disadvantages of testifying, and allowed Rowland to make the decision whether to testify. Rowland confirmed with the trial court that he was properly informed of and understood both his right to testify and his right not to testify and indicated he would exercise his right to testify. In the absence of any evidence to the contrary, the inference drawn from this record is that it was Rowland's decision to testify. "Defense

14

counsel have no power to prevent their clients from testifying." (*People v. Lucas* (1995) 12 Cal.4th 415, 444.)

"Judicial review of counsel's performance is deferential . . . ." (*In re Gay, supra*, 8 Cal.5th at p. 1073.) It is the defendant's burden to demonstrate that counsel's representation " ' "fell below an objective standard of reasonableness." ' " (*Rices, supra*, 4 Cal.5th at p. 80.) When Rowland filed his new trial motion, he did not provide a declaration or affidavit stating that counsel had not sufficiently discussed with him his options regarding testifying, or that he would have made a different decision about testifying if counsel had told or advised him not to do so. Nor did Rowland testify to these matters at the hearing on the new trial motion. Counsel's unrebutted testimony established that counsel had a practice of advising each defendant of his right not to testify, discussed the advantages and disadvantages of testifying, and allowed the defendant to make the decision whether to testify. Counsel's testimony further established that he assisted Rowland in preparing for direct testimony and cross-examination. In the absence of countervailing evidence, the record supports the conclusion that counsel's performance was reasonably competent.

Rowland contends that counsel's failure to tell him not to testify was unreasonable because his taking the stand to testify resulted in the admission of his prior convictions.[7] Defense counsel was not asked during the hearing on the motion for new trial whether he had considered the potential ramifications of the prosecution being allowed to impeach Rowland with his prior convictions, whether he had discussed this issue with his

---

[7]     Rowland admitted to the prior convictions in his direct testimony, presumably to preclude the prosecutor from impeaching him with them on cross-examination.

client, or whether he had concluded that the disadvantages of such disclosure outweighed any potential advantages to testifying. Moreover, it was Roland's decision to testify at trial, and it is Rowland's burden on appeal to demonstrate that his trial counsel rendered ineffective assistance. Yet, Rowland has presented no evidence that indicates that his counsel did not tell him that if he testified, he could be impeached with his prior convictions, or that if counsel had told him this, Rowland would not have testified. The lack of such evidence from Rowland is a glaring omission under the circumstances of this case.

Rowland further contends that his taking the stand to testify allowed the prosecutor to show the jury the previously unseen video footage of the driver of the getaway car at the time of the robbery of the gas station next door to the car wash in San Bernardino County. Rowland's trial counsel testified that in discussing Rowland's decision whether to testify, counsel told Rowland that if Rowland did not testify, the prosecution would not be able to show the previously unseen video. Rowland has not provided a declaration or testimony contradicting counsel's testimony, or any other aspect of his discussions with counsel. However, the record indicates that Rowland was advised of and understood both his right to testify and his right not to testify, that he discussed the advantages and disadvantages of testifying with counsel, and that, as noted, his counsel specifically discussed with him the possibility that this previously unseen video footage could be shown to the jury if Rowland were to testify.

The fact that the jury returned an unfavorable verdict does not establish that counsel's performance was deficient. "Defendant's unprovable assertion that, in hindsight, he would have been 'better served' by not

16

testifying does not establish a denial of the effective assistance of counsel." (*People v. Hinton* (2006) 37 Cal.4th 839, 917.)

On this record, we conclude that Rowland has not met his burden to establish that counsel's performance " ' "fell below an objective standard of reasonableness under prevailing professional norms." ' " (*Rices, supra*, 4 Cal.5th at p. 80.) Because Rowland has not established deficient performance, we need not determine whether he has established the requisite prejudice. (*Strickland, supra*, 466 U.S. at p. 697 ["there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one"].) The trial court properly denied Rowland's motion for a new trial based on ineffective assistance of counsel. (*Taylor, supra*, 162 Cal.App.3d at p. 726.)

II.

Romero *Motion*

Rowland contends that the trial court abused its discretion when it denied his *Romero* motion to dismiss (or "strike") his prior strike convictions, which dated back to 1997. We conclude that the trial court did not abuse its discretion.

A. *Additional Background*

In 1998, Rowland was convicted of murder, attempted murder, and robbery in connection with offenses that occurred in 1997. (§§ 187, 664, 211.) These convictions were overturned on appeal, and in 2002, Rowland pled guilty to attempted murder and voluntary manslaughter (§§ 187, 664, 192) and received a significantly shorter sentence than the one initially imposed. In 1998, Rowland was convicted of being an inmate in possession of a weapon (§ 4502, subd. (a)), a felony. Rowland was released from prison in 2009 and in 2010 violated parole when he committed the misdemeanor offense of

17

driving under the influence of alcohol. (Veh. Code, § 23152, subd. (b).) In 2012, Rowland was convicted of illegally possessing a firearm, a felony offense, and was sentenced to another prison term. (§ 12021, subd. (a)(1).) Rowland was released from prison in June of 2017 and committed the current offenses in June of 2018.

Prior to sentencing, Rowland asked the court to exercise its discretion to dismiss (or "strike") his prior strike convictions—the 2002 convictions for manslaughter and attempted murder—for sentencing purposes. He argued that these convictions were remote in time—committed more than 20 years before the charged offenses—and that they were committed when Rowland was only 17 years old. He argued that he did not fall within the spirit of the Three Strikes law and that, even without third-strike sentencing, he was facing a long sentence in this case.

The prosecutor opposed the motion, arguing that, although the initial offenses were committed in 1997 when Rowland was only 17, the offenses involved a violent shooting that resulted in the death of one victim and seriously injured a second victim. After Rowland was discharged from prison, he violated parole and was subsequently convicted of illegally possessing a firearm. The prosecutor argued that Rowland had demonstrated a long history of committing both serious and violent felonies.

At a hearing on Rowland's *Romero* motion, the trial court considered the nature and circumstances of the prior strike convictions and observed that, although they were committed more than 20 years ago, they were "very, very serious." The trial court concluded that the convictions were not so remote in time as to be excluded from consideration. The trial court further observed that, according to the probation report, the prior convictions involved a simultaneous conviction for robbery. In addition, the trial court

18

considered the nature and circumstances of the new offenses, robbery, and observed that Rowland was also convicted of being a principal in the offenses in which a principal was armed with a weapon at the time of these offenses. The trial court considered Rowland's background, character, and prospects, observing that Rowland displayed "a continuing record of severity" that involved a history of a violent offenses. The trial court observed that Rowland's conduct has been "recidivous" over the last 20 years. The trial court denied the motion, finding that Rowland fell within the spirit of the Three Strikes law.

B. *Applicable Law*

"[A] trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony . . . 'in furtherance of justice' pursuant to . . . section 1385(a)." (*People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*); *Romero, supra*, 13 Cal.4th at p. 508.) An order striking such an allegation is a determination that in the interest of justice, a defendant should not be required to undergo a statutorily increased penalty based on a judicial determination of the prior felony conviction. (*Romero*, at p. 508.)

In ruling whether to strike a prior serious and/or violent felony conviction allegation under the Three Strikes law, the trial court must consider, in view of the nature and circumstances of the defendant's current felony offense, prior serious and/or violent felony convictions, and background, character, and prospects, whether "the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams, supra*, 17 Cal.4th at p. 161.) The trial court's order is reviewed on appeal under the deferential abuse of discretion

19

standard. We consider whether the decision of the trial court falls outside the bounds of reason under the applicable law and the relevant facts. (*Id.* at p. 162.)

C. *Analysis*

Rowland has not met his burden on appeal to show that the trial court abused its discretion when it determined that he should not be deemed to be outside the spirit of the Three Strikes law. In declining to exercise its discretion to dismiss one or more of Rowland's strike priors, the trial court properly considered Rowland's criminal history, the current offense, and Rowland's background, character, and prospects. (*Williams, supra*, 17 Cal.4th at p. 161.)

The trial court acted within its discretion when it found that Rowland came within the spirit of the Three Strikes law. (*Romero, supra*, 13 Cal.4th at p. 508.) In 2002, Rowland was convicted of attempted murder and voluntary manslaughter (§§ 187, 664, 192) in connection with offenses committed in 1997. According to the probation report, the 1997 offenses also involved a robbery. As an inmate, Rowland was convicted of possessing a weapon. (§ 4502, subd. (a).) In 2012, he was convicted of illegally possessing a firearm. (§ 12021, subd. (a)(1).) Rowland's current offenses involved a series of armed robberies and multiple victims.

The trial court considered the "very, very serious" nature of the offenses Rowland committed in 1997, which resulted in two gunshot victims, one of whom died from his wounds. The trial court found that these offenses were not so remote in time as to be excluded from consideration. (See *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 [finding that the trial court erred in striking a 20-year-old strike conviction as remote in time when the defendant continued to lead a life of crime after the prior conviction].)

20

Although Rowland received a significant reduction in his prison term when his initial conviction was overturned on appeal, he violated parole in 2010 and was subsequently convicted of felony possession of a firearm. Rowland's current robbery offenses also involved the use of a firearm. The trial court observed that Rowland had "a continuing record of severity" and his "conduct has been recidivous over the last 20 years." Having considered the appropriate factors, the trial court concluded that Rowland came within the spirit of the Three Strikes law and denied his *Romero* motion.

In reviewing a ruling on a *Romero* motion, this court may not reverse for abuse of discretion unless the appellant shows that the trial court's ruling was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) Rowland has not made this showing.

DISPOSITION

The judgment is affirmed.

AARON, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.

21